IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Robert Hale, | ) | Case No. 1:09-cv-00060 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ROBERT HALE'S RESPONSE** |
| vs. | ) | **TO STATES' MOTION TO** |
| | ) | **DISMISS AND MADC'S** |
| State of North Dakota, by and through | ) | **MOTION TO DISMISS** |
| the North Dakota Department of | ) | |
| Commerce; Shane Goettle, Director, in | ) | |
| His official capacity as Director of the | ) | |
| Department of Commerce; the Minot | ) | |
| Area Development Corporation; and the | ) | |
| City of Minot, | ) | |
| | ) | |
| Defendants. | ) | |

This case involves the expenditure of the State of North Dakota and its many

subdivisions of probably one or two hundreds of million of dollars of taxpayer

money going to individuals, associations, or corporations in direct contravention of

article X, Section 18, of the North Dakota Constitution.   MADC alone has

distributed over $30,000,000 of taxpayer money in violation of the state

constitution.  Much of the money has been given away as nothing more than a gift

to friends; some money has been given to the largest corporations in the land; and

some has been loaned out based on specific guarantees of a specific contractual

requirement of the number of jobs to be created, with such contract being totally

ignored by the City of Minot, resulting in such taxpayer funds being given away

1

regardless of the stated requirements of the contract between the City of Minot and

the individual, association, or corporation who received this public largess,

eventually with no strings attached. The framers of the North Dakota Constitution

specifically tried to prevent this very thing from happening. Until 1992, the

constitutional provision was given meaning and served as a deterrent to the

donation of taxpayer money to wealthy corporations and others who were more

than happy to receive free money from the public coffers. It is time to stop the

unconstitutional disbursement of public funds – monies directly derived from taxes

– to corporations in violation of the North Dakota Constitution.

### Procedural Posture and Constitutional Prohibition

The State of North Dakota has made a motion to dismiss or in alternative for

more specificity, asserting that the complaint – which clearly requests a declaratory

judgment that the State's distribution of public funds to individuals, associations,

and corporations through its economic development program that such distribution

of public funds in violation of article 10, section 18 of the North Dakota

Constitution – is not specific enough for the State to comprehend its meaning. In

addition, the MADC has made a motion to dismiss, asserting that it is a private

entity not subject to article X, section 18 of the North Dakota Constitution, despite

the fact that much of the money distributed by MADC is public monies sent to

2

MADC from the city of Minot specifically for the purpose of MADC acting as a

conduit (if not agent) for the distribution of these public funds.

Article 10, section 18, provides the following language:

> **Section 18.** The state, any county or city may make internal
> improvements and may engage in any industry, enterprise or business,
> not prohibited by article XX of the constitution, but neither the state
> nor any political subdivision thereof shall otherwise loan or give its
> credit or make donations to or in aid of any individual, association or
> corporation except for reasonable support of the poor, nor subscribe to
> or become the owner of capital stock in any association or
> corporation.

By the specific terms contained in this constitutional provision, Robert Hale

contends that the state and the city of Minot are improperly loaning or giving its

credit, making donations to or in aid of individuals, associations and corporations

in violation of section 18 and that according to that constitutional provision any

such actions are allowed only for reasonable support of the poor.  Robert Hale

further contends that the state and the City of Minot have improperly become the

owners of capital stock in associations and corporations, also in direct violation of

section 18.  For purposes of the pending motions, the facts alleged in Robert Hale's

complaint are taken as true.[1]

---

[1] The court must accept as true all factual allegations set out in the complaint. **Friends of Lake
View School District Incorporation No. 25 of Phillips County v. Beebe**, 578 F.3d 753, 756
(8th Cir. 2009).  The Court is allowed to consider some materials that are part of the public record
in deciding a Rule 12 (b)(6) motion to dismiss.  Id. at 762 n. 12, citing **_State of Missouri ex rel.
Nixon v. Coeur D'Alene Tribe,_** 164 F.3d 1102, 1107 (8th Cir.1999).  Because the defendants
have demanded more specificity, Robert Hale has in response to that motion had to add in
additional factual material.  In our view, the added material simply reiterates and demonstrates

## **Background**

The State of North Dakota has expended tens of millions of public dollars in conjunction with its economic development programs.  Most of the money has gone to corporations.  Much of the money has been in the form of grants or loans; some of the grants were given with the full expectation that the money would never be returned (i.e., a clear donation); many of the loans were never repaid and constituted a gift to that company.  This expenditure of public money has not been for adequate consideration or as a payment for services rendered; the entire economic development program has at its core the realization that the money is indeed being given away – with the putative hope that the "investment (really a gift or donation) will eventually "assist" the State of North Dakota and its citizens by perhaps the indirect benefit of additional taxes derived from the business or its future (hoped for) employees.

As shown by the attachments hereto, Minot's Magic Fund has taken more than $30 ½ million dollars ($30,610,256) in taxpayer funds and given it to entities prohibited from receiving taxpayer money by Article X, Section 18.   The complaint alleges, and Robert Hale asserts there and in his affidavit, the following:

---

the factual basis of the allegations contained in the complaint and as such this matter can be decided under Rule 12, taking all allegations made in the complaint as true.  If, on the other hand, the Court considers these additional materials as providing information that is necessarily outside the pleadings then the Court resolves the motion under Rule 56 as a summary judgment motion, nonetheless viewing the evidence and all inferences that may be reasonably drawn in the light most favorable to the nonmoving party, i.e., to Robert Hale.  **Blair v. Wills**, 420 F.3d 823, 827 (8th Cir. 2005).

- A significant amount of the money given (grants) or loaned was either never paid back or the entities that received the money went out of business and thus never paid it back.
- Many of the loans and/or grants were given to entities that were connected with or part of the committee that was responsible for "handing out the money."
- The entity (MADC and the City of Minot) provided either NO oversight to ensure compliance with the terms and conditions of the loans and/or grants or routinely ignored both and continued to give money to these private entities and individuals even when the entities failed to meet the agreed conditions required to receive the money.
- While there were "guidelines" established that were intended to see that oversight and limitations were placed on the use of the public funds – EVERY guideline was intentionally violated over and over.  The response given when this practice was questioned was, "they are just 'guidelines' not requirements".
- The requirement to monitor the number of jobs impacted was ignored.  The numbers that were reported – upon verification efforts and analysis – were consistently OVER STATED, inaccurate or never monitored.  The end result to date – after 19 years of operation of the Magic Fund – is there is absolutely no reliable data as to whether or not the expenditure of more than $30 million in taxpayer funds provided any measurable benefit to anyone.
- The Magic Fund has cost taxpayers more than $30,000,000.  Many millions went to entities that went out of business.  A significant amount of the money went to friends of those overseeing the distribution of the money.  Virtually every dollar of the Magic Fund money went to entities that were either – "individuals, associations or corporations" and not, "for reasonable support of the poor."
- Taxpayer dollars have been given to some of the largest corporations in the world (e.g. ING received more than $6,000,000 from the state and the Magic Fund.  ING is the 8th largest corporation in the world.  Northrop Grumman Corporation (one of America's largest defense contractors) received a $92,900 grant from the Magic Fund.
- due to over active "giving away of taxpayer money" the Magic Fund became insolvent and had to cease doing business for a number of years because it had not only exhausted the funds it had from taxpayers it oversubscribed the funds to the tune of more than $6,000,000.  In an effort to continue its lending the entity went to the voters of the City of Minot to request that funding they had voted to bring water to Northwest North Dakota (NAWS –

Northwest Area Water Supply) be diverted to the Magic Fund. The voters rejected this request.

**Complaint &Attachment 1 at 1.1 to 1.4.**

## Proper Method of Interpretation of the North Dakota Constitution

A review of the North Dakota Supreme Court cases that describe the rules

relating to the interpretation of the North Dakota Constitution may be found in

Boughey, *An Introduction to North Dakota Constitutional Law: Content and*

*Methods of Interpretation*, 63 N.D. L. REV. 157, 209-228 (1987). **Attachment 2.1**

**to 2.21**. An outline of those rules relating to text-based analysis is listed by the

author as follows:

> *Preamble:*   The object of construction is to give effect to the intent of the
> people adopting it.
>
>    1. *Plain Language Controls:*  The intent is to be found in the instrument
>       itself
>    2. *Harmonizing Rules:*
>           a. The whole instrument is to be examined with a view to arriving
>              at the true intention of each part;
>           b. effect is to be given, if possible, to the whole instrument;
>           c. is different portions seem to conflict, harmonize them if
>              possible;
>           d. when harmonizing lean in favor of construction which will
>              render every word operative;
>           [e. special language controls over more general language;] and
>           [f.  if a conflict still exists, apply the more recently adopted
>           provision.]
>      3. *Construing Ambiguous Language:*  If an ambiguity still exists,
>    consider:
>           a. the object to be accomplished;
>           b.  the prior state of the law, especially a predecessor constitution
>               and any changes made; and

    c. contemporaneous and practical constructions, especially if acquiesced to for a considerable period.

Boughey, *An Introduction to North Dakota Constitutional Law: Content and Methods of Interpretation*, 63 N.D. L. Rev. 157, 212 (1987). **Attachment 2.5.** As described by the author, the first form of interpretation to be employed by the court is applying the plain language of the constitutional provision; if application of the plain language resolves the issue, there is no need to apply harmonizing rules or review the history or intent of the constitutional provision. This text-based method of interpretation of the North Dakota Constitution was applied and adopted by the North Dakota Supreme Court in **Johnson v. Wells County Water Resource Bd.**, 410 N.W.2d 525, 528 (1987).

In our view, section 18 clearly prohibits – by its own plain language – the State or any of its subdivisions from distributing any public funds for economic development because such distributions are gifts or loans to individuals, associations, and corporations.

> **Section 18.** The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article XX of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation.

7

The language of Section 18 seems perfectly clear:  The state, county or city themselves may engage in an industry, enterprise or business (except involving liquor) "but neither the state nor any political subdivision may loan or give its credit or make donations to or in the aid of any individual, association or corporation except for reasonable support of the poor."  In addition, by its plain language, neither the state nor any political subdivision may subscribe to or become the owner of capital stock in any association or corporation.[2]  The entire section, to retain any meaning, must be given effectiveness, and the way to do that is to limit the state, a county, or a city to <u>itself</u> be the entity that engages in the business or enterprise and declare that giving public money to "any individual, association or corporation except for reasonable support of the poor" is prohibited by the state constitution.

Although a plain reading of the section ought to be sufficient, we note that this view derived from the plain reading of the text is, in addition, supported by 1) the framers statements at the 1889 state constitutional convention; 2) the legislative

---

[2]  If the court does consider the language contained in section 18 in any way conflicting, then the court must attempt to harmonize the conflicting language, trying to ensure that the whole instrument is to be examined with a view to arriving at the true intention of each part and that effect is to be given, if possible, to the whole instrument.  In the event the court were to conclude that the economic development system is authorized by the first portion of section 18 (relating to allowing the state, a county, or a city to engage in a business or enterprise of economic development) such a conclusion would render the remaining language (prohibiting the loans or giving credit or allowing donations "to or in aid of any individual, association or corporation except for reasonable support of the poor") ineffective and deleted from the constitution by court interpretation.

discussions relating to changes being proposed to section 18; 3) the cases

interpreting section 18; and 4) the debates contained in the 1972 constitutional

convention (which decided not to change the provision),

### Overview of History Surrounding Article X Section 18 [Section 185][3]

Article XII, Section 185 of the North Dakota Constitution originally

included the following language:

> **Section 185** Neither the State nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the State engage in any work of internal improvement unless authorized by a two-thirds vote of the people.

**Attachment 3 – Historical Documents Relating to Section 185 Part 1 at 3.1.**

### 1) The Framers' Debates at the 1889 State Constitutional Convention

During the debates of the convention of 1889, only four individuals testified in

regards to the proposed language.  Debates of the North Dakota Constitutional

Convention 1889 at 437-438.  **Attachment 3 at pages 3.2 to 3.3.**

Mr. Wallace moved to strike the portion relating to "unless authorized by a

two-thirds vote of the people" because he wanted the State to be able to make

internal improvements without having to go through a vote of the people.  Debates

---

[3] Marilyn, Senior Liberian of the Legislative Research Council, as part of her duties to assist the public, was kind enough to pull together the history of section 185 at my request.  That history is attached in its entirety as **Attachment 3, 5, and 7 – Historical Documents Relating to Section 185 – Part 1, 2, & 3.**

at 438, **Attachment 3 at page 3.3.** Mr. Wallace's amendment failed. **Id.** Mr.

Bartlett of Griggs moved to strike out all the language after the word

"corporation," which would have deleted the entire last twenty words, thereby once

again deleting a requirement that the people would have to approve internal

improvements. **Id.** Mr. Bartlett of Dickey stated that this issue was thoroughly

discussed by the committee, and the language should be left as it is. **Id.** Mr. Moer

stated that the proposed language should remain as it is because he thought the

legislative power should be limited: "I believe the amendment should not prevail.

I think that the legislative power should be limited. They should not be allowed to

go into great works without the sanction of the people." **Id.** The original section

was therefore adopted without change, and the provision was eventually adopted

by the people of North Dakota and became Article XII Section 185 of the North

Dakota Constitution.

## 2) The Legislative Discussions Relating to Changes Being Proposed

In 1913 the legislature proposed an amendment to Section 185 of the

Constitution in which was added a last sentence that allowed the State to

appropriate money or raise money by taxation for the construction or improvement

of public highways. 1913 S.L. Ch. 100 at 126 – **Attachment 3 at page 3.4.** This

addition to Section 185 was approved by the people at the general election held on

November 3, 1914. 1915 S.L. Amendments to Constitution at 403– **Attachment 3**

**at 3.8.** Thus, following the amendment that was passed in 1914, the restrictions relating to making donations or becoming owner of capital stock continued, and the State was not allowed to engage in any internal improvements unless authorized by two-thirds vote of the people, except in regards to construction or improvement of public highways.

In the legislative session of 1915, the legislature killed the proposal for a state owned terminal elevator.  E. Robinson, History of North Dakota, at 330 (1966) – **Attachment 4 – Robinson History of North Dakota at 4.4.**  As a result, the Nonpartisan League was formed, which one of its specific goals to allow the State of North Dakota and its political subdivisions the right to directly engage in business.[4]   After taking over the house but being thwarted by senate in regards to enacting its program, the Nonpartisan League decided to amend the State Constitution.  In the election of 1918, the Nonpartisan League succeeded in amending the Constitution to legalize much of the League's program, including

---

[4] A.C. Townley, a former socialist organizer, recognized the anger at the defeat of this proposal and decided to form a new farmers' organization, the Nonpartisan League. The new organization grew rapidly; by the winter of 1915-1916 it had 26,000 members. Id. at 328-329, 332-334 – **Attachment 4 at 4.6 to 4.8.**  The primary tenets of the platform of the Nonpartisan League were "state ownership of terminal elevators, flour mills, packing houses, and cold-storage plants; state inspection of grain and grain dockage; exemption of farm improvements from taxation; state hail insurance on an acreage-tax basis; and rural-credit banks for low-interest loans." Id. 331 – **Attachment 4 at 4.5.**  The Nonpartisan League endorsed Lynn Fraiser for governor in 1916, who carried every county and received 79% of the vote.  Id. 336-337 – **Attachment 4 at 4.10 to 4.11.**  "The League elected 81 of the 113 members of the house, but only 18 of the 49 members of the Senate (24 senators were holdovers and did not stand for election)." Id. 337- **Attachment 4 at 4.11.**  However, because the Nonpartisan League did not have the majority in the Senate, they were unable to enact its program in the 1917 legislative session.  Id. 338- **Attachment 4 at 4.12.**

authorizing the State to engage in business.  Id. 340-341 – **Attachment 4 at 4.14 to 4.15.**[5]

On November 5, 1918, the citizens of North Dakota, through the initiated amendment process, amended Section 185 to add in the power of the state and political subdivisions to engage in any industry, enterprise, or business.[6]  Rejecting conservative arguments that the provision was socialistic in nature and that it had not passed, the 1919 legislature declared (by passing House Bill 12) that the amendment of section 185 had indeed passed by a majority vote and had become part of the Constitution at the general election that occurred on November 5, 1918. Journal of the House January 14, 1919 at 64-65 and Journal of the Senate January 17, 1919 at 75-76 – **Attachment 5 –  Historical Documents Relating to Section 185 Part 2 at 5.2 and 5.5 to 5.6.**  Significantly, the prohibition against providing any credit or donations to "any individual, association or corporation except for the

---

[5] As a result of this change in the Constitution, the Legislature passed five laws which created the Industrial Commission, Bank of North Dakota, North Dakota Mill and Elevator Association, The Home Building Association, and an amendment to the State Hail Insurance System.  Id. 342– **Attachment 4 at 4.16.**  In 1919, in both state and federal courts, opponents to the League program argued that "the laws [that] required taxation for other than a public purpose [deprived] the tax payers of their property without due process of law, a violation of the fourteenth amendment."  Id. 346– **Attachment 4 at 4.20.**  Federal Judge Charles F. Amidon dismissed the federal law suit, stating that the "State elevators, mills, and packing houses were the only effective means by which the farmers could escape economic injustices at the hands of the great combinations of the terminal cities." Id. 346 – **Attachment 4 at 4.20,** referring to **Scott v. Fraiser,** 258 F. 669 (D.C.N.D. 1919).  According to Professor Robinson, the State Supreme Court decided a similar case in Green v. Fraiser, and reached the same result.  Id.  346 – **Attachment 4 at 4.20.**

[6] The vote at the general election was 46,830 of votes yes for the constitutional amendment, 32,574 no, and 14,256 individuals who voted for the Governor but did not vote yes or no on the amendment.  1919 House Journal at 67, **Attachment 5 at 5.3.**

reasonable support of the poor" continued as part of section 185, as well as the

prohibition against any of those entities becoming "owner of capital stock in any

association or corporation."

### 3) The Cases Interpreting Section 18

There are thirty cases discussing or interpreting article X, section 18 of the

North Dakota Constitution: Twenty-eight are decisions of the North Dakota

Supreme Court, and two are federal decisions (Judge Amidon and the same case on

appeal to the 8th Circuit Court of Appeals). [7]

Within five years after the enactment of section 185 (now article X section

12), the North Dakota Supreme Court in **Martin v. Tyler,** 4 N.D. 278, 60 N.W.

---

[7] **State v. Nelson County,** 1 N.D. 88, 45 N.W. 33 (1890); **Martin v. Tyler,** 4 N.D. 278, 60 N.W. 392 (1894); **Redmon v. Chacey,** 7 N.D. 231, 73 N.W. 1081 (1898); **Erskine v. Steele County,** 87 F. 630 (D.N.D. 1898); **Steele County v. Erskine,** 98 F. 215, 39 C.C.A. 173 (8th Cir. 1899); **State v. Hauge,** 37 N.D. 583, 164 N.W. 289 (1917); **State ex rel. Gaulke v. Turner,** 37 N.D. 635, 164 N.W. 924 (1917); **Bauernfeind v. Nestos,** 48 N.D. 1218, 189 N.W. 506 (1922); **State ex rel. Kaufman v. Davis,** 59 N.D. 191, 229 N.W. 105 (1930); **State ex rel. Eckroth v. Borge,** 69 N.D. 1, 283 N.W. 521 (1939); **Petters & Co. v. Nelson County,** 68 N.D. 471, 281 N.W. 61 (1938); **Marks v. City of Mandan,** 70 N.D. 474, 296 N.W. 39 (1941); **Stutsman v. Arthur,** 73 N.D. 504, 16 N.W. 2d 449 (1944); **Egbert v. City of Dunseith,** 74 N.D. 1, 24 N.W. 2d 907 (1946); **Herr v. Rudolf,** 75 N.D. 91, 25 N.W. 2d 916 (1947); **Payne v. Board of Trustees of the Teachers' Ins. & Retirement Fund,** 76 N.D. 278, 35 N.W. 2d 553 (1948); **Weber v. Weber,** 77 N.D. 142, 42 N.W. 2d 67 (1950); **Solberg v. State Treasurer,** 78 N.D. 806, 53 N.W. 2d 49 (1952); **Ferch v. Housing Authority of Cass County,** 79 N.D. 764, 59 N.W. 2d 849 1953); **State v. Amerada Petroleum Corp.,** 71 N.W. 2d 675 (N.D. 1955); **Wallentinson v. Williams County,** 101 N.W. 2d 571 (N.D. 1960); **Northwestern Bell Telephone Co. v. Wentz,** 103 N.W. 2d 245 (N.D. 1960); **Menz v. Coyle,** 117 N.W. 2d 290 (N.D. 1962); **Gripentrog v. City of Wahpeton,** 126 N.W. 2d 230 (N.D. 1964); **Kelly v. Guy,** 133 N.W. 2d 853 (N.D. 1965); **City of Fargo v. Fahrlander,** 199 N.W. 2d 30 (N.D. 1972); **Patterson v. City of Bismarck,** 212 N.W. 2d 374 (N.D. 1973); **Blocker Drilling Canada, Ltd. v. Conrad,** 354 N.W. 2d 912 (N.D. 1984); **Adams County Record v. Greater North Dakota Ass'n,** 529 N.W. 2d 830 (N.D. 1995); **Saefke v. Stenehjem,** 2003 ND 202, 673 N.W. 2d 41 (N.D. 2003).

392 (1894), clearly indicated that distributing State money to the Drain

Commissioners – with that money being controlled not by the County

Commissioners but exclusively by the Drain Commissioners – violates section

185, despite the argument that draining swamp and overflowed lands will conduce

to the health and welfare of the community and benefit highways. **Martin v.**

**Tyler,** 4 N.D. 278, 60 N.W. 392 (1894).  Four years later, the North Dakota

Supreme Court approved the new drainage law, specifically holding that the act

was constitutional because under the new law the County was not liable for

payment of bonds and the amount of benefit received by the State did not exceed

the cost of the bonds; in other words, there was a specific and direct benefit in the

exact amount that was paid by the State.  **Redmon v. Chacey,** 7 N.D. 231, 73

N.W. 1081 (1898).

However, in situations where the State was in reality making a donation or

giving its credit, where the State pays out any monies without a specific and equal

benefit, then such a distribution is a donation that violates section 185.  (**Erskine v.**

**Steele County,** 87 F. 630 (D.N.D. 1898)(Federal District Court  Judge Amidon,

ruled that payment of a contract is neither a gift nor donation when full value has

been received), affirmed **Steele County v. Erskine,** 98 F. 215, 39 C.C.A. 173 (8th

Cir. 1899); **State ex rel. Gaulke v. Turner,** 37 N.D. 635, 164 N.W. 924 (1917),

diversion of twenty percent of grain storage fees for the purpose building a public

grain storage warehouse violated section 185 and was found unconstitutional, but the remainder of the act allowing fees to be used for regulation of the grain inspection system was valid; **Bauernfeind v. Nestos,** 48 N.D. 1218, 189 N.W. 506 (1922) contract between Industrial Commission and investment companies to pay soldiers benefits and the Industrial Commission issuing notes to those investment companies unconstitutional as an improper loan and pledging of the State's credit; **State ex rel. Kaufman v. Davis,** 59 N.D. 191, 229 N.W. 105 (1930), authorization of non-profit associations to build dormitories does not violate section 185 because the use of the State land for building the dormitory is not a donation because ample consideration is received for the use of the site.

The North Dakota Supreme Court, in several of its early decisions, explicitly stated the **purpose of section 185**. According to **State v. Nelson County,** 1 N.D. 88, 45 N.W. 33 (1890), section 185 permitted counties to lend aid for the necessary support of the poor,

> "to our mind, the restrictive words of that section were intended to prevent the loan of aid either to individuals or corporations, for the purpose of fostering business enterprises, either of a public or private nature; but that the people who adopted the constitution, as well as those who framed the instrument, expressly intended by the language of that section to grant a power affirmatively to the municipal corporations named in section 185, to lend their aid and make donations for the "necessary support of the poor." (…) [the] class referred to in the exception contained in section 185 of the State Constitution is the poor and destitute farmers of the state, and that the first legislature which met after the state was admitted has, by the seed-grain statue, put a proper construction upon the language in question."

15

**State v. Nelson County,** 1 N.D. 88, 45 N.W. 33 (1890).

In **Erskine v. Steele County,** 87 F. 630 (D. N.D. 1898), Judge Amidon of the federal District Court specifically described why section 185 and other similar constitutional provisions were adopted by North Dakota and other states: "they were adopted to correct the abuse by which municipalities particularly in the west, were overwhelmed with debt to gratuitous donations to aid in the construction of railroads and other like enterprises of internal improvements." **Erskine v. Steele County,** 87 F. 630, 635 (D.N.D. 1898), aff'd, **Steele County v. Erskine,** 98 F. 215, 39 C.C.A. 173 (8th Cir. 1899).

The North Dakota Supreme Court in **State ex rel. Kaufman v. Davis,** 59 N.D. 191, 229 N.W. 105 (1930), indicated a similar understanding of the purpose of section 185: "the purpose of section 185 of the constitution was primarily to inhibit the state from indulging in the practices, which thereto fore had been vogue in many other states, of making donations, or giving or loaning the state's credit, to companies promising to construct railways or other internal improvements. The language of the section is sweeping and all inclusive." **State ex rel. Kaufman v. Davis,** 59 N.D. 191, 229 N.W. 105, 112 (1930).

In **Northwestern Bell Telephone Co. v. Wentz,** 103 N.W. 2d 245 (N.D. 1960), the North Dakota Supreme Court parsed section 185 in great detail, and concluded that section 185 did not prohibit the legislature from "the making of

internal improvements or engaging in industry, enterprise or business." 103 N.W. 2d at 254. The Court therefore concluded that the State may make internal improvements in regard to the construction maintenance of State highways. In other words, the North Dakota Supreme Court concluded that the first portion of section 185 allowed the State to make internal improvements and engage in any industry, enterprise or business, but the State nor any other political subdivision shall otherwise loan or give its credit or make donations. 103 N.W. 2d 253-255.

But it is the State or any County or City that may make internal improvements and may engage in industry, enterprise or business, and not some non-State entity. As such, any public monies given to or distributed to any type of corporation to be used for disbursement as part of an economic development program is illegal under section 185 of the North Dakota Constitution. This interpretation was more clearly articulated in **Gripentrog v. City of Wahpeton,** 126 N.W. 2d 230 (N.D. 1964):

> "Thus section 185 authorizes the State and any county or city to engage directly in any industry, enterprise, or business except the business of engaging in the traffic of liquor, subject to the restrictions of the due-process clause of the Federal Constitution. "
> "Section 185 does not prohibit the making of loans or giving of credit or making donations in connection with a city's engaging in any industry, enterprise, or business except engaging in liquor traffic. What it does prohibit is for a city "otherwise" to make loans or give its credit or make donations. In other words, making loans or giving credit may be done in connection with a city's engaging in any permissible industry, enterprise or business, but not otherwise."

**Gripentrog**, 126 N.W. 2d. 237-238.  The **Gripentrog** Court went on to state that

the **Wentz** case in 1960 had indicated where the State, or a City is actually

engaged in a permissible industry, enterprise, or business, it would necessarily

have to be able to be involved in lending, giving credit, and making donations.

126 N.W. 2d. 238.  In the **Gripentrog** case, the North Dakota Supreme Court

concluded that the City was engaging in an enterprise, the enterprise of leasing a

sugar processing plant, and that the City under section 185 was specifically

authorized and empowered to engage in any enterprise under that section not

otherwise prohibited by section 185, and to loan and give its credit as to that

enterprise.  The Court went on to state that it is not a violation of section 185

because the City "is, in fact, engaging in an enterprise which is specifically

authorized under section 185."  126 N.W. 2d. 238.However, in this particular case,

it is not the State or the City of Minot that is active and actually engaged in fact in

an enterprise, but it is donating money and giving its credit to non-state and non-

governmental third parties, indeed corporations, which is clearly not authorized by

section 185.[8]

### 4) The Debates of the 1972 Constitutional Convention

---

[8] Although the decisions interpreting section 18 do allow retirement and other special funds to be invested in corporations, the basis of such an exception is the fact that the monies at issue are in reality not state or public monies but are monies held in trust for state or other public employees.

18

In regards to the Constitutional Convention of 1972, the Convention proposed a change to section 185, but the Constitution proposed by the 1972 Constitutional Convention was <u>not</u> approved by the State[9]; in addition, the proposed 1972 amendment to section 185 was never successfully adopted by the people of North Dakota.[10]  As such, the language adopted by the people of North Dakota in 1918 and confirmed by the 1919 legislative session is the language that presently applies.  However, because most of our state constitution is now derived from subsequent piece-meal adoption of the 1972 proposed revision to the entire constitution, the framers of the 1972 state constitution have added some indication in regards to what the 1972 delegates thought of section 185 as it continues to exist and how the language of section 185 prevents the use of state money for things such as a state-wide economic development programs.

It is interesting to note that the delegates of the 1972 constitutional convention believed strongly that taxpayer money should be used only for public services (thereby further limiting such expenditures) <u>and that the constitutional as it then read (and continues to read today) prohibited any kind of a venture to improve job opportunities in this State.</u> [11]

---

[9] **Haugland v. Meier**, 339 N.W.2d 100, 107 (N.D. 1983), **McCarney v. Meier**, 286 N.W.2d 780, 789 n. 1 (N.D. 1979).
[10] Annot. to art. 10, section 18, N.D.C.C..
[11] The 1972 Constitutional Convention attempted to limit the State or any of its political subdivisions from undertaking any business or enterprise "only for the purpose of providing public services."  **Attachment 6 -- Debates of 1972 Constitutional Convention page 1096 at**

## Questionable Relevance of Attorney General Opinions

For almost one hundred years after the original passage of the anti-gifting

clause in 1889, as well as for seventy years after the addition of the provision

allowing the State to engage in industry enterprise or business, the Attorney

---

**6.2.** The language proposed by the 1972 Convention continued the prohibition of loaning or giving credit or aiding any individual association or corporation, with the exception "for reasonable support of the indigent" but added that payments to veterans as may be provided by law; the proposed language also continued the prohibition against the State or any of its political subdivisions subscribing to or becoming "the owner of capital stock in any private association or corporation." **Id.** The delegates to the 1972 Constitutional Convention adopted this language by a vote of 69 to 27. Id. at 1108, **Attachment 6 at 6.14.** In choosing between the phrase "public service" and "public benefits," Delegate Lerberg noted that in suggesting public services the Committee felt that the word "public benefit" was too broad. Id. at 1096 (emphasis added) -- **Attachment 6 at 6.2.** It is significant to note that Delegate Chase attempted to amend the business or enterprise section to delete the limiting "public service" language so that the State or subdivisions could undertake any business or enterprise and not just "for the purpose of providing public services." Id. at 1096-- **Attachment 6 at 6.2.** Of special note is the fact that Delegate Chase wanted to remove the quoted language because he believed that the original language of the Constitution, if maintained, would "forever, as I see it, close the opportunity of tax payers participating in any kind of a venture to improve job opportunities in this State." Id. at 1097 --**Attachment 6 at 6.3** (emphasis added). A member of the Committee that drafted the language, Delegate Unruh, stated that the desire was to limit businesses that the State or political subdivisions could go into and that they did not want state businesses going into a business that is competitive to private free enterprise. Id. at 1098 -- **Attachment 6 at 6.4.** Another member of the Committee, Delegate Lerberg noted the definition from Black's Dictionary of public service is "a term applied in modern usage to the objects and enterprises of certain kinds of corporations, which specifically serve the needs of the general public or conduce to the comfort and convenience of an entire community, such as railroad, gas, water, and electric light companies; in companies furnishing motor vehicle transportation." Id. at 1098 -- **Attachment 6 at 6.4.** Delegate Chase continued later, stating "there may be some cases where the tax payers of this State might like to become involved on a project that would be beneficial to all the people in the State; and yet, under the original language in this particular thing that is proposed to us now, they would be restricted, and this is my point." Id. At 1101 -- **Attachment 6 at 6.7** (emphasis added). After substantial debate, Delegate Lerberg once again, on behalf of the Committee, indicated that the limiting to public services was considered appropriate by the Committee because the term "public benefit" was felt to be too broad for the intent of the Committee. Id. at 1103 -- **Attachment 6 at 6.9.**

General's Office repeatedly enforced the anti-gift clause.[12]  Only recently has the

Attorney General used the semantics of "economic development" as a state

enterprise to sanction the gifting and donating of state funds to individuals,

associations or corporations through private non-profits created for that purpose.[13]

---

[12] Attachment 7, provided by the Legislative Research Council Librarian, provides an overview of the many Attorney General Opinions relating to Section 185. **Attachment 7 – Historical Documents Relating to Section 185 – Part 3.**  In 1956, the Attorney General included that the anti-gift clause prohibited the State Seed Department in contributing money to help defray legal expenses in a State of Washington case.  **Id. at 7.4, AG Opinion September 4, 1956.**  In 1957 the Attorney General ruled that Burleigh County could not use tax money to help maintain and operate a privately owned ambulance service.  **Id. at 7.4, AG Opinion August 13, 1957.**  Also in 1957, the Attorney General ruled that the workers compensation fund, bonding fund, teachers insurance and retirement fund could invest its money in building in loan associations and savings of loan associations since the money was not technically State money but was instead money being held in trust for others and were construed as special funds, although the Attorney General stated that the same could not be said for the Hail Insurance Funds since the statute did not make it a special fund.  **Id. at 7.3, AG Opinion September 3, 1957.**  In 1958 the Attorney General ruled that the Burke Township could not levy tax for a township community chest to cover charity drives, stating explicitly that some of the objectives of the community chest drive could not be deemed as "reasonable support of the poor" and as such any such tax would be prohibited under the anti-gift provision of the constitution.  In other words, the Attorney General concluded that if any of the money was going to something other than reasonable support of the poor, then the distribution of any such funds was prohibited.  **Id. at 7.3, AG Opinion March 24, 1958.**  In 1962, the Attorney General, following the 1960 <u>Wentz</u> case, ruled that the city of Ellendale could not donate money to a private corporation for the development of a dam site, but it could make contributions to the local water conservation flood control district and the state water conservation commission if those items were in the budget.  **Id. at 7.3, AG Opinion January 30, 1962.**  In 1967, referring to the 1960 <u>Wentz</u> Case, the Attorney General concluded that state retirement funds could be invested in corporate common stock because although the State is per say prohibited from owning corporate common stock, the purchase of those stocks is through the state employees retirement fund and in that regard the state is engaged in the investing business for its employees.  **Id. at 7.2 to 7.3, AG Opinion January 4, 1967.**  Finally, in 1969, the Attorney General concluded that a township could not give money to the Red Cross, Muscular Dystrophy, Heart and Cancer Foundations because not all the organizations limit their activities to helping the poor.  **Id. at 7.2, AG Opinion December 29, 1969.**  In 1978 the Attorney General concluded that there is "substantial doubt" that an across-the-board tax refund or rebate would be valid in light of Section 185.  **Id. at 7.10, AG Opinion June 27, 1978.**

[13] **Attachment 8 – Recent Attorney General Opinions** has three Attorney General opinions which have served as the basis for allowing the State and political subdivisions to give taxpayer monies to private entities for economic development.  In 1992, the Attorney General concluded

In short, the Attorney General has said a valid "business or enterprise" of government is the loaning, giving of its credit or making donations to individuals, associations or corporations.  In our view if this is the direction chosen it must be

---

that it was not a violation of the anti-gifting clause of the constitution for the Board of University and School Lands to invest money from the Coal Severance Tax Trust Fund and the Myron G Nelson Fund, a public corporation.  In reaching this conclusion, the Attorney General cited **Gripentrog v. City of Wahpeton**, 126 N.W. 2d. 230, 237-38 (N.D. 1964) in which the Court ruled that cities revenue bonds issued under the municipal industrial development act for the construction of a sugar beet processing plant which is through the city proposed to lease to a private company was not prohibited because the city was actually engaging in an industry, enterprise, or business and was not "otherwise" making loans or given as credit or making donations to something other than a industry, enterprise or business in which the city was engaged.  Referring to the 1960 <u>Wentz</u> case, the Supreme Court stated that in those situations where the state or one of its subdivisions is actually engaged in an industry, enterprise or business, it would necessarily need to be involved in lending, giving credit, or the making of donations.  **Northwest Bell Telephone v. Wentz**, 103 N.W. 2d. 245 (N.D. 1960).  Based on this, the Attorney General concluded that the Board of University and School Lands could invest money from the Coal Severance Tax Trust Fund in the Myron G Nelson Fund.  **AG Opinion 92-13 (August 19, 1992), Attachment 8 at 8.1 to 8.6.**

In 1993 the Attorney General concluded that Sheridan County has the power to guarantee a loan made by a coop to the local non-profit development corporation if the county complied with chap. 11-11.1, a statute that authorized counties "to engage in economic development projects under specified circumstances" and avails itself of that authority.  **A.G. Opinion 93-L-129 (April 12, 1993), Attachment 8 at 8.7 to 8.10.**

Later in 1993 the Attorney General concluded that a home-rule city which has not created a job development authority may nonetheless engage in the enterprise of giving grants and making loans to private entities pursuant to an ordinance adopted under its home rule charter provided the home rule charter authorizes the home rule city to engage in enterprises and the implementing ordinance . . . provides assurance that the activity has a public purpose, details the manner of implementing the activity, and provides for supervisory controls to ensure the public purpose is met.  **A.G. Opinion 93-F-11 (August 11, 1993), Attachment 8 at 8.11 to 8.16.**

Finally, in 1995 the Attorney General concluded that a county may under ch. 11-11.1 loan monies to a private entity for economic development if such a loan is made through a county job development authority, through an economic development organization pursuant to ch. 11-11.1, or through a joint powers agreement.  In reaching this conclusion, the Attorney General specifically concluded that art. X, section 18 is not violated because the city is engaging "in the enterprise of economic development by creating a city job development organization under N.D.C.C. ch. 40-57.4" and that a home-rule city "may engage in the enterprise of giving grants and making loans to private entities" if the home-rule charter allows it to do so and "provides assurance that the activity has a public purpose" and ensures "supervisory controls."  **A.G. Opinion. 95-L-233 (October 11, 1995), Attachment 8 at 8.17 to 8.19.**

done by amending the constitution not violating it. We are aware of the persuasive

effect of attorney general opinions[14] and note that given the history of Section 185

that if any of the Attorney General opinions should be given persuasive effect, it

should be the earlier ones that comport with the history and intent of that

constitutional provision. In our view, Attorney General Hietkamp improperly

agreed to the semantics of pretending that the word "enterprise" in the

constitutional provision allowed using third-parties as substitutes for actual state-

run businesses or enterprises, and by doing so demonstrated that she too had

improperly become –along with many North Dakotan leaders in the 1990s –

mesmerized by the supposed value and questionable logic that the state, by giving

away public money to wealthy individuals and corporations, would somehow

provide a benefit to all of the citizens of North Dakota. But the Constitution is

designed to prevent such delusions or public whims based on the protestations of

snake-oil salesman who happen to wear suits. We fail to understand how the act of

giving away taxpayer money to private individuals or corporations could be

---

[14] Although not binding on the courts, the persuasiveness of attorney general opinions is described in **State v. Brown**, 2009 ND 150, ¶ 20, 771 N.W.2d 267, 275: "Formal opinions of the attorney general are entitled to respect, and courts should follow them if they are persuasive. Baukol Builders, Inc. v. County of Grand Forks, 2008 ND 116, ¶ 28, 751 N.W.2d 191; Riemers v. City of Grand Forks, 2006 ND 224, ¶ 11, 723 N.W.2d 518. Although not binding on the courts, an attorney general opinion nevertheless has an important bearing upon the construction and interpretation of a statute. Baukol Builders, at ¶ 26; Edinger v. Governing Auth. of Stutsman County Corr. Ctr., 2005 ND 79, ¶ 13, 695 N.W.2d 447." Where there are contrary attorney general opinions, it is our view that those which most persuade the Court as being consistent with the history and purpose of the legislation or constitutional provision should be adopted by the Court.

properly construed as an "enterprise" or "business." The act of giving taxpayer money away to an individual, association, or corporation cannot in any way be properly construed as the running of a state business or enterprise. Such a system is obviously a system designed to donate money and as such is invalid under the plain language of section 185 as well as the clear history of that constitutional provision. North Dakota has a state bank that is allowed under section 185. If the state wants to make loans it must do so through a state bank which is a state-owned enterprise.

In addition, where there is no accountability – as aptly shown by recent auditor reports – such a Pollyanna view has no factual support; but more essential to the question at hand, ignoring the dictates of the state constitution that on its face prohibits such conduct and as a matter of history is antithetical to what the constitution says and the framers intended, is a abdication of the responsibility of all civic leaders to uphold the constitution and laws that apply to them and their office.

### Application of History, Modification, and Decisions Relating to Section 18

In our view, the plain language of the constitutional prohibition relating to the gifting clause remains in full effect, and in addition the plain language of the constitutional provision allows only the State to engage in an "industry, enterprise or business."

It is clear from the history of section 185 and the changes that have been made to it that the prohibition against giving monies to individual associations or corporations that is not for the reasonable support of the poor is prohibited. State or political subdivisions are the only entities that can use State money for running an actual business. Thus, providing money to some individual association or corporation to run a business is prohibited by the anti-gifting provision of 185, now article X section 18 of the North Dakota Constitution.

As discussed in more detail below, providing the State or public money directly or indirectly to individuals, associations, or corporations violates this provision of the North Dakota Constitution, as well as the many cases that conclude that doing something indirectly that is prohibited directly is not allowed.

In regards to the lack of accountability at the Commerce Department, the State Auditor recently issued a report on the Commerce Department noting numerous problems in accountability. **Attachment 9 – Performance Audit Report, Department of Commerce Report No. 3027 (August 11, 2009) at 9.1 to 9.61.**[15] There are also serious due process issues that arise where public money is

---

[15] This state auditor report clearly indicates that the department of commerce, despite a legislative requirement to do so, has totally failed to provide an economic justification for the expenditures made or shown any demonstrated value for the taxpayer money being spent in the state in conjunction with its economic development programs. See generally Executive Summary at 9.5; see also 9.7 ("there is no determination being made as to whether the Centers of Excellence are having the desired economic impact" as required under Section 15-69-04); 9.12 ("No formal agreements are entered into between the Centers of Excellence Commission and approved applicants. Thus, no contract provisions are specifically identified related to the

given to private individuals or corporations without the state receiving an equal value in return.  Giving taxpayer money away without receiving a public benefit equal to the money given away is a violation of due process:

> "The courts of this country, and of all countries where constitutional liberty exists, agree with the elementary writers upon the science of government that it is essential to the validity of a tax that it be laid for a public purpose. Difficulty has frequently arisen in discriminating between public and private objects; but where the object is primarily to foster private enterprises, and the only benefit to be derived by the public is incidental and secondary, the tax will be annulled by the courts as an abuse of the legislative prerogative." **State v. Nelson County,** 1 N.D. 88, 45 N.W. 33 (1890).

Significantly, the origin of the North Dakota Constitution is one of placing individual rights above the interest of the government or private (and particularly large or wealthy) persons or corporations.[16]

## The MADC as a "Private" Entity not Subject to Article 10, Section 18

---

appropriate use of funds and other requirements which must be followed."); 9.15 ("In our review of the monitoring process, we identified no formal policies and procedures for monitoring the progress of the Centers of Excellence."); 9.17 ("we identified noncompliance issues relating to state law, noncompliance with reporting requirements, and indications of Centers of Excellence not meeting expectations.  For example: . . . One Center of Excellence application projected job creation of 35-38 private sector positions.  Based on information provided by the Centers of Excellence, a total of one private sector job and six positions at the university have been created in the three year span of the project." );  9.36 (the state's non-profit development corporation, the North Dakota Development Fund, Inc., failed to obtain personal guarantees and failed to require a financially committed local financial institution); 9.60 ("it is clear to us Lewis and Clark funds should not have been expended on non Lewis and Clark activities").  According to Appendix B, the Centers of Excellence distributed approximately $40 million in taxpayer money.

[16] Boughey, *An Introduction to North Dakota Constitutional Law: Content and Methods of Interpretation*, 63 N.D. L. Rev. 157, 253-259 (1987), view referred to by Justice Levine (concurring and dissenting) in **State v. Jacobson**, 545 N.W.2d 152, 160 (N.D. 1996) & **State v. Ringquist**, 433 N.W.2d 207, 217 (N.D. 1988).  **Attachment 2, pages 22-28.**

The MADC asserts that because it is a private entity Article 10 Section 12 of the North Dakota Constitution does not apply to it. However, in contending that Robert Hale's Complaint only asserts that the MADC is a private entity, it fails to provide the other allegations contained in the Complaint. In other words, the MADC grabs onto the first half of Robert Hale's assertion, but totally ignores the second half: Robert Hale asserts in the Complaint that MADC is a private entity that is distributing public monies on behalf of the City of Minot, and as such is acting as an agent of the City and is in conjunction with the City doing indirectly what the City cannot by law do directly. There should be no doubt that the MADC is dispensing public monies, as shown clearly in its own annual report. The majority of its funds come from the City of Minot, and indeed according to their most recent report the percentage of public funds[17] has increased recently.

---

[17] In addition, the definition of public funds under North Dakota law – Section 21-04-01(5) – is extremely broad, stating that any funds derived from taxation are considered public funds:

> 5. "Public funds" includes all funds derived from taxation, fees, penalties, sale of bonds, or from any other source, which belong to and are the property of a public corporation or of the state, and all sinking funds of such public corporation or of the state, and all funds from whatever source derived and for whatever purpose to be expended of which a public corporation or the state have legal custody. The term includes funds of which any board, bureau, commission, or individual, created or authorized by law, is authorized to have control as the legal custodian for any purpose whatsoever whether such funds were derived from general or special taxation or the assessment of persons or corporations for a specific purpose. The term does not include funds of students or student organizations deposited in a student financial institution approved by and under the control of the school board.

N.D.C.C. Section 21-04-01(5). This broad interpretation has allowed the Minot Daily News and citizens of Minot to obtain the records relating to the expenditures of MADC money and other

It is not speculation or conjecture that the MADC is distributing public monies, and even based on its own arguments as to its powers as a nonprofit corporation, the MADC through its own response has already admitted that it is providing grants, loaning money, and providing donations. Although the statute may allow these powers, it is axiomatic that any statute that is in contravention of a state constitutional provision is unconstitutional. The mere fact that the statute states that nonprofits have those powers cannot circumvent the constitutional prohibition directed to the state and its subdivisions, either directly or indirectly. As shown by the many cases relating to direct and indirect contravention of laws, the same should apply even more forcefully to any attempts to contravene the state constitution, a document adopted by the people directly. It is clear that MADC is an agent of the state and in conjunction with the City of Minot is violating Article 10, Section 18 of the state constitution. Its designation as a private entity does not change this reality, or the factual assertion that is made in the complaint that – for purposes for the Motion to Dismiss – must be considered as being true.

The MADC (and the more recent AG opinions) attempt to justify the state's economic development program by disbursing public monies to a non-profit, third party. The State and MADC also assert that the economic development program is

---

city money that was distributed to third parties, despite the MADC attempting to hide its distribution of public monies from the press and the public. [17]  See N.D.C.C. Section 44-04-17.1 (public record statute) & **Attachment 10 – MADC Open Records Attorney General Opinions.**

an "enterprise" allowed under article X section 18 even though it is not the state that is actually running the enterprise. Because the state relinquishes control over the distribution of the public monies, this distribution method cannot survive proper constitutional review, as clearly shown in a previous North Dakota decision where the North Dakota Supreme Court declared the distribution of public monies through a drainage committee (instead of the county commission itself) as clearly unconstitutional. **Martin v. Tyler,** 4 N.D. 278, 60 N.W. 392 (1894).

The legislature, in fact, passed legislation emphasizing this point as it relates to using private agreements to contravene a law established for a public reason. In addition, Section 31-11-05(4) of the North Dakota Century Code provides that "a law established for a public reason cannot be contravened by a private agreement." NDCC Section 31-11-05(4) specifically prohibits any public entity from engaging in such fiction.

Use of these non-profit corporations is still the act of giving money to a corporation, which is directly contrary to the language of the article X, section 18. Nor is it appropriate to accept the fiction that the state is running an "enterprise of economic development." The state and the state subdivisions are not running the business of economic development; they are turning over money to many other entities and it is those entities that decide where the money goes.

In our view, the state cannot do indirectly what it cannot do directly.   There

is a maxim for legal principle that declares that that which cannot be done directly

cannot be done indirectly.   Numerous North Dakota cases demonstrate the

principle that one cannot do indirectly that which is prohibited directly.[18]   Perhaps

---

[18] **Higgins v. Trauger**, 2001 ND 149, ¶ 21, 632 N.W.2d 463, 471 ("the effect of the principle which precludes one under obligation to pay taxes from becoming the purchaser at a sale for delinquency in payment of taxes cannot be evaded by such person by allowing the property to be sold to a third person and then purchasing it from him, by organizing a corporation and causing the tax deed to be made to it, or by any other collusive arrangement which would directly or indirectly defeat the operation of the rule'); **In Interest of K.B.**, 490 N.W.2d 715, 719 N.D.,1992 (The faulty interpretation also allows a presumed father to do indirectly what he cannot do directly-declare the nonexistence of his paternity any time he is called upon to provide child support. Aside from violating the plain meaning of the statute, such a construction also trivializes and diminishes the legislative goal)( Levine, J., specially concurring); **Resolution Trust Corp. v. Dickinson Econo-Storage**, 474 N.W.2d 50, 52 (N.D. 1991) ("At oral argument to this court, various scenarios were suggested through which local taxing authorities could thus use Section 57-45-01 to accomplish indirectly what they cannot do directly and surreptitiously convert their in rem rights against tax-delinquent property into a personal money judgment against the owner. We do not believe that the legislature intended that absurd and illogical result."); **Wenman v. Center Bd. of Valley City Multi-Dist. Vocational Center**, 471 N.W.2d 461, 463-464 (N.D. 1991) (To expect a teacher to accept or reject a contract with a severe reduction in salary for *464 curricular activities, without providing the teacher with a nonrenewal hearing as required by Section 15-47-38(5), N.D.C.C., is to ignore that fact. It would permit to be accomplished indirectly, without a hearing, what cannot legally be accomplished directly without a hearing."); **Sykeston Tp. v. Wells County**, 356 N.W.2d 136, 143 (N.D. 1984) (It argues that a county's authority to maintain a county road under Section 24-05-17, N.D.C.C., involves the discretionary powers of a county and that recovery in this case allows the townships to accomplish indirectly what they cannot do directly, *i.e.*, maintain county roads and bill the county for the service.); **Langenes v. Bullinger**, 328 N.W.2d 241, 246 (N.D. 1982) ("the award of the money judgment in addition to the other remedies provided by the judgment would permit the Langeneses to accomplish indirectly what they could not accomplish directly through an action pursuant to the cancellation statutes or foreclosure statutes."); **Quarles v. McKenzie Public School Dist. No. 34**, 325 N.W.2d 662, 667 (N.D. 1982) ( "To expect a teacher to accept or reject a contract with a severe reduction in salary for curricular activities, without providing the teacher with a nonrenewal hearing as required by Section 15-47-38(5), N.D.C.C., is to ignore that fact. It would permit to be accomplished indirectly, without a hearing, what cannot legally be accomplished directly without a hearing. The *Enstad* decision and the cases cited therein apply to a change in assignment of duties without a reduction in salary or with a corresponding increase in salary."); **Paluck v. Board of County Com'rs, Stark County**, 307 N.W.2d 852, 857 (N.D. 1981) ( "If we were to determine that the statutes creating the Tax Appeals Board are valid by labeling the

the best articulation of this principle is contained in **Langenes v. Bullinger**, 328

N.W.2d 241, 246 (N.D. 1982), where the North Dakota Supreme Court state the

following:

> Equity follows the letter and the spirit of the law and courts of equity are
> bound by and must follow and apply the principles of substantive law.
> *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D.1974) (on petition for
> rehearing). Furthermore, it is a common maxim that the law does not permit
> by indirection what cannot be accomplished directly. *Cf., Northern States
> Power Co. v. Hagen*, 314 N.W.2d 32, 38 (N.D.1981) [PSC could not
> indirectly assert jurisdiction over wholesale rates by investigating
> reasonableness of underlying costs in proceeding involving retail rates]; *State
> v. Skar*, 313 N.W.2d 746, 748 (N.D.1981) [appellate court could not broaden
> scope of review beyond that exercised by the court in which certiorari was
> sought because it would frustrate statutory purpose and permit counsel to

---

Board an administrative agency rather than a court, but with the same powers as a court, we
would permit to be done indirectly what cannot be done directly."); **Hovland v. Hovland**, 104
N.W.2d 6, 7-8 (N.D. 1960) ("As was said in Hoellinger v. Hoellinger, 38 N.D. 636, 166 N.W.
519, 521: '*8 'This court has held that there can be no such thing as a trial de novo in the
Supreme Court upon an appeal from a portion of the judgment, and there are excellent reasons
why an appellant cannot do indirectly, upon an appeal from a judgment, what he is not permitted
to do directly by appealing from a portion of the judgment.'"); **Henry v. Henry**, 77 N.D. 845,
858-859, 46 N.W.2d 701, 708 (N.D. 1951) ("As was said in Hoellinger v. Hoellinger, 38 N.D.
636, 166 N.W. 519, 521, 'What (plaintiff) really contends for is a right to have a review of a
portion of the judgment appealed from. This court has held that there can be no such thing as a
trial de novo in the Supreme Court upon an appeal from a portion of a judgment, and there *859
are excellent reasons why an appellant cannot do indirectly, upon an appeal from a judgment,
what he is not permitted to do directly by appealing from a portion of the judgment.'"); **Murphy
v. Townley**, 67 N.D. 560, 274 N.W. 857, 859 (N.D. 1937) ("We then show that where one has
no such certificate [of admission] and no right to practice law directly he "cannot do so indirectly
by employing a licensed attorney to practice for it [him], as that would be a mere evasion of the
law."); **Cain v. Merchants Nat. Bank & Trust Co. of Fargo**, 66 N.D. 746, 268 N.W. 719, 719
& 722 (N.D. 1936) ("One who has no right to practice law directly cannot do so indirectly by
employing a licensed attorney to practice for him."); **Hoellinger v. Hoellinger**, 38 N.D. 636, 166
N.W. 519, 521 (N.D. 1918) ("This court has held that there can be no such thing as a trial de
novo in the Supreme Court upon an appeal from a portion of the judgment, and there are
excellent reasons why an appellant cannot do indirectly, upon an appeal from a judgment, what
he is not permitted to do directly by appealing from a portion of the judgment."); **Reid v. Her**,
36 N.D. 552, 162 N.W. 903, 907 (N.D. 1917) ("As an attorney may not directly stipulate to
extend the time for appealing, he cannot do it indirectly by any waiver or stipulation to vacate a
judgment or to hear a motion for a new trial after the lapse of the time for appeal.").

accomplish by indirection what he could not accomplish directly]; *Paluck v. Board of County Commissioners, Stark County*, 307 N.W.2d 852, 857 (N.D.1981) [statutes creating tax appeal board because they established a court which was not authorized by the North Dakota Constitution and to label the tax appeal board an administrative agency would permit to be done indirectly what could not be done directly]; *Atlas Ready-Mix of Minot, Inc. v. White Properties, Inc.*, 306 N.W.2d 212, 222 (N.D.1981) [agreement to purchase materials could not sanction indirectly what it did not sanction directly]; *State v. Morrissey*, 295 N.W.2d 307, 310 (N.D.1980) [appellate court cannot broaden scope of review beyond the exercise by the court in which certiorari was sought because it would frustrate the statutory purpose and permit counsel to accomplish by indirection what could not be accomplished directly]. In *Gajewski v. Bratcher, supra* at 642, we said that "equity must not accomplish by indirection what the law has prescribed must not be done directly."

In this instance we believe the award of the money judgment in addition to the other remedies provided by the judgment would permit the Langeneses to accomplish indirectly what they could not accomplish directly through an action pursuant to the cancellation statutes or foreclosure statutes.

**Langenes v. Bullinger**, 328 N.W.2d 241, 246 (N.D. 1982).

## Request for Specifics

The State has under Rule 12(e) asserted that the Complaint is not specific enough to indicate what the legal issue is. Obviously we disagree. Under our modern rules a complaint is supposed to be a concise, straight forward, plain statement of the issue at hand and a listing of the facts alleged relating to that issue. That has been done. The facts alleged are taken as true for the purposes of a motion to dismiss. It is clear that the compliant, with sufficient detail, is attempting to determine whether the distribution of public monies by the State or any of its subdivisions to private corporations and other individuals and

32

associations violates article X section 18 of the North Dakota Constitution. It is clear that the State is engaged in distributing public monies to private associations, private individuals, and corporations for the purpose of economic development. It is also clear, as will be shown below, that many of the grants and other loans and monies are being given to companies, and that there is an understanding by the State itself that there will be occasions where this money will not be returned in any way.

The assertion that the state needs a more definitive statement is a complete red herring. First, under the rules of pleadings the Plaintiff is only required to provide a clear and concise statement of the claim involved. Robert Hale has done so in sufficient detail within the complaint in regards to the unconstitutionality of any public monies, including loans, grants or credit being provided or expended for anything other than support of the poor, as spelled out in article X section 18 of the North Dakota Constitution. Second, it is the state – and not the Plaintiff, without appropriate opportunity for discovery, – that has access to the information relating to the use of public monies for economic development purposes or other purposes in which that public money goes to private individuals, associations, or corporations.

We will obtain and provide that information to the state itself through discovery. However, it is clear through the state's own websites and public

33

information that public money is being distributed on a regular basis to private individuals, associations and corporations, just as it is clear that the state and its public subdivisions have obtained ownership of certain corporations, all of which is in clear violation of article X section 18.  Unlike the attorney for the State of North Dakota, the Plaintiff's attorney does not have access to all of the budgets or records of the various government entities and political subdivisions that provide money to private individuals, associations and corporations.

In regards to the state's assertion of the numerous statutes that may be involved, the Plaintiff's response is simply and clear:  if the statutes listed by the state authorize or facilitate the distribution of state or political subdivision funds in contravention of article X section 18 – each of those statutes is unconstitutional.

The Plaintiff, Robert Hale, as shown by his affidavit, has been active in regards to the economic development program used by the City of Minot.  He has also taken the time to review the State of North Dakota's distributions of economic development funds, and has pulled together documentation from the State's own records and press releases that clearly demonstrate that the State and political subdivisions are indeed distributing public monies to an aid of individuals, associations, and corporations.  In addition, Mr. Hale has attempted to work with the Magic Fund and the City of Minot to obtain accountability in regards to these distributions, but as shown in the documents attached to this brief he has been

34

unsuccessful in obtaining true accountability on behalf of the City of Minot or the

Magic Fund. Unfortunately, the State itself, by a recent audit of the Commerce

Department, has also been determined by the State Auditor to have woefully

inadequate accountability in regards to economic development monies distributed

by the Commerce Department.

Rule 12(e) allows a defendant to move for a more definitive statement, but

only if "a pleading to which a responsive pleading is permitted is so vague or

ambiguous that a party cannot reasonably be required to frame a responsive

pleading. The motion must point out the defects complained of and the details

desired." The complaint in this matter is detailed and specific; it properly indicates

the issue to be determined and properly alleges that public monies are being used

in contravention of art. 10, section 18, of the North Dakota Constitution. Unless

the state denies that there is any such spending (which it can do in a responsive

document) the allegation is sufficiently specific. It is not necessary for the Plaintiff

to list every statute that may be affected; if the Court rules that such expenditures

are illegal or prohibited under the constitutional mandate, then it is up to the state

to make sure that state monies are not so expended, under any statute or legislative

framework.

If the Defendant wants further information in regards to the factual basis

beyond what is listed in the Complaint, then it is has the option of initiating and

conducting discovery in this matter.  Nonetheless, even though there appears no

basis under Rule 12(e) for a demand of specifics in a situation where the

Complaint provides a plain and concise statement of the issues, we nonetheless

provide a statement of specifics to the Defendants in conjunction with our response

to the motion to dismiss.  Specifically, Mr. Hale has prepared a statement of

specifics in regards to the North Dakota State Commerce Department's violations

of article X section 18 of the North Dakota Constitution between 2000 and 2009.

**Attachment 11 –More Definitive Statement, Commerce Department Records**

Following Robert Hale's statement of specifics is an attachment of exhibits that

clearly demonstrate these violations.[19]  The following table provides an overview

of the specifics provided by Mr. Hale in regards to the Commerce Department's

distribution of 154 separate fundings to at least 120 separate entities:

| Year | Fundings | Number of Recipients |
|---|---|---|
| 2000 | 22 | 18 |
| 2001 | 21 | 19 |
| 2002 | 13 | 12 |
| 2003 | 11 | 11 |
| 2004 | 17 | 14 |
| 2005 | 18 | 12 |
| 2006 | 17 | 16 |
| 2007 | 13 | 11 |
| 2008 | 12 | 11 |
| 2009 | 7 | 7 |

---

[19] In Exhibit 1 through Exhibit 10, Mr. Hale through each exhibit goes year by year through the Commerce Department's records and identifies the following specific separate funds to different recipients, some of which are individuals, and some of which are associations or corporations.

In response to the specifics relating to the types of distributions made by the Commerce Department, Plaintiff Robert Hale has provided an additional statement of specifics as **Attachment 12 –More Definitive Statement, Commerce Department Press Releases,** and provides following that attachment a listing of fifteen separate exhibits (Exhibit A through Exhibit O) of press releases by the Commerce Department itself from June 30, 2009 to September 15, 2009 in which the Commerce Department clearly indicates the fact that article X section 18 is being violated.[20]  Indeed, Director Shane Goettle specifically states as recently as September 15, 2009, that "the State doesn't expect the business planning and technical assistance grants to be repaid." **Attachment 12,  Exhibit A at 12.3.** Obviously these disbursements are merely gifts or donations.

In regards to the Magic Fund, Mr. Hale has pulled together documentation from public records showing Minot Magic Fund funding from 1991 to 2000 **Attachment 13 – Magic Fund 1991 - 2000**, and a separate listing of Magic Fund funding from 2001 to 2008 **Attachment 14– Magic Fund 2001 - 2008**, as well as

---

[20] In Exhibit A, Commerce Commissioner Shane Goettle states that, "the State doesn't expect the business planning and technical assistance grants to be repaid."  In Exhibit B, the State confirms that nearly fifteen pieces of legislation were passed in support of emPower ND, including grants. In Exhibit C, the Commerce Department confirms an interest buy down and tax concessions to a pea processing plant.  In Exhibit D, the Department confirms providing $350,000 to one company, $1.35 million to another company, and $100,000 to a third company.  In exhibit E, Commissioner Goettle confirms that North Dakota has a number of tax and job training incentives for manufacturers.  In exhibit G, the Commerce Department confirms that the State of North Dakota provided a $400,000 grant for an energy park.  In Exhibit J, the article states that North Dakota provided $400,000 in interest buy down to a processing facility.  Exhibits L, M, and O, describe the numerous grants provided to private businesses.

a listing of the top thirty companies which received Magic Fund funding from

1990 to 2000 **Attachment 15 – Magic Fund Top 30 Companies**. According to

these documents, the Magic Fund expended over $6 million of public monies in

2001 to 2008, and over $24 million in funding from 1991 to 2000. In regards to

the top thirty Magic Fund recipients from 1990 to 2000, those recipients received

over $24 million of funding from Magic Fund, almost all of which was derived

from taxes and derived from public funds.

The City itself confirms, in its 2008 Annual Compliance Report, that the

revenues for the Magic Fund come directly from sales tax collections.

**Attachment 16 – 2008 Annual Compliance Report at page 16.10.**

Plaintiff Robert Hale's knowledge of the Magic Fund is demonstrated not

only by his familiarity with the public records and expenditures of that fund, but

also his serving on the Magic Fund Performance Audit Committee in 2002. As a

member of that Committee, Mr. Hale attempted to assist the City in developing

true accountability in regards to the expenditure of public funds through the Magic

Fund, particularly in regards to determinations whether the companies or

individuals receiving those funds actually fulfilled their contractual obligations

relating to receiving those funds, particularly before providing that person or entity

even more Magic Funds money. **Attachment 17 – Hale Review of MADC**

**Accountability Problems.** Unfortunately, as shown by public articles throughout

38

2008 and a recent article in 2009, it is clear that the Magic Fund has failed entirely

to create true accountability in regards to the Magic Fund. **Attachment 18 –**

**Minot Daily News Articles.**[21]

Finally, should there be no doubt about the City of Minot itself actually

dispensing funds to private corporations and failing to hold corporations to the

requirements of the Magic Fund and basic accountability, as is shown by the Info

Tech debacle. **Attachment 19 – InfoTech Documents.** The documents relating to

InfoTech show the direct distribution of taxpayer money to InfoTech, as shown by

City of Minot check no. 194175 to Info Tech for $200,000 on February 9, 2007,

$93,333 on March 7, 2007, and City of Minot check no. 1947255 to Info Tech for

$166,667 on March 23, 2007. Id. at 19.15, 19.18 & 19.19. According to the

contract with Info Tech (dated March 26, 2007, <u>after</u> the City had paid out the

---

[21] In the article of October 23, 2008 the article reports that the City failed to follow its own guidelines in 2006 in regards to approving a deal with a medical technology company, only to have the company pull out because the company did not realize that a personal guarantee would be required. **Attachment 18 at 18.1.** On June 4, 2008, representatives of the MADC noted that the MADC "is increasingly dependent on city money" and stated that "direct payments from the City to MADC are substantial and are becoming a larger portion of its annual operating resources." **Attachment 18 at 18.2.** According to the article, MADC received $305,000 in direct payments from the City in 2006 and again in 2007, and since its inception, MADC has disbursed $25.6 million to more than 200 entities. **Id.** As recently as November 2008, representatives of the Magic Fund "suggested the city be more flexible towards companies that failed to achieve promises in their development agreements for reasons beyond their control." **Attachment 18 at 18.3.** Obviously failure to require a company to fulfill its obligations is a breach of the agreement, and also results in the monies being provided to that company in reality becoming a donation. According to a March 28, 2009 article, the Magic Fund set aside $1.1 million to develop an energy park, with the MADC reimbursing the money minus its costs upon the sale of the land. **Attachment 18 at 18.4.** The final lot was sold, resulting in the total amount being returned to the Magic Fund of approximately $800,000.00. **Id.** As such, the Magic Fund basically gave away $300,000.00 to the various entities who received that land at a cheaper price than the City paid for it.

money!), the City of Minot would pay $200,000 at time of closing as a cash grant

and the remaining $200,000 as a forgivable loan based at the rate of $13,333.33 for

each full-time employee when the loan conditions are met. Id. at 19.21. Only after

Robert Hale raised the issue of whether Info Tech had fulfilled its obligations

(**19.32**) did the City recognize that the agreement had been breached. **Id. at 19.39.**

Despite notifying Info tech that it owed the City of Minot money for non-

fulfillment of its agreement, the City eventually wrote-off and forgave the loan.

**Attachment 1 – Affidavit of Robert Hale at 1.3.**

## Conclusion

For the reasons stated above, the State's motion and MADC's motion to

dismiss should be denied; in addition, the State's motion and MADC's motion for

a more definitive statement should also be denied.

Dated this 4th day of November, 2009.

Lynn M. Boughey (04046)
Attorney for Robert Hale
P.O. Box 836
Bismarck, ND 58502-0836
(701) 751-1485

**Attachment 1-- Affidavit of Robert Hale**

**Attachment 2 -- Boughey Law Review Article**

**Attachment 3 -- Historical Documents Relating to Section 185 Part 1**

**Attachment 4 – Robinson History of North Dakota**

**Attachment 5 -- Historical Documents Relating to Section 185 Part 2**

**Attachment 6 -- Debates of 1972 Constitutional Convention**

**Attachment 7 – Historical Documents Relating to Section 185 – Part 3**

**Attachment 8 – Recent Attorney General Opinions**

**Attachment 9 -- Performance Audit Report, Department of Commerce Report No. 3027 (August 11, 2009)**

**Attachment 10 – MADC Open Record Attorney General Opinions**

**Attachment 11 –More Definitive Statement, Commerce Department Records & Press Releases**

**Attachment 12 –More Definitive Statement, Commerce Department Press Releases**

**Attachment 13 – Magic Fund Funding 1991 - 2000**

**Attachment 14– Magic Fund Funding 2001 - 2008**

**Attachment 15 – Magic Fund Top 30 Funded Companies**

**Attachment 16 – 2008 Annual Compliance Report at page 16.10**

**Attachment 17 – Hale Review of MADC Accountability Problems**

**Attachment 18 – Minot Daily News Articles**

**Attachment 19 – InfoTech Documents**

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Robert Hale, | ) | Court File No. 1:09-cv-00060 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **CERTIFICATE OF SERVICE** |
| State of North Dakota, by and | ) | |
| through the North Dakota Department | ) | |
| of Commerce; Shane Goettle, Director, | ) | |
| in his official capacity as Director of | ) | |
| the Department of Commerce; the | ) | |
| Minot Area Development Corporation; | ) | |
| and the City of Minot, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I hereby certify that on November 4th, 2009 the following document(s):

**Robert Hale's Response to State's Motion to Dismiss and MADC's
Motion to Dismiss (and 19 attachments)**

was filed electronically with the Clerk of Court through ECF, and that ECF will
send a Notice of Electronic Filing (NEF) to the following:

Randall J. Bakke      rbakke@smithbakke.com
Brian Van Grinsven  bvangrinsven@mcgeelaw.com
Douglass A. Bahr     dbahr@nd.gov

Lynn M. Boughey
Attorney for Defendant
lynnboughey@midconetwork.com