# Attachment 2

# Boughey Law

# Review Article

# AN INTRODUCTION TO NORTH DAKOTA CONSTITUTIONAL LAW: CONTENT AND METHODS OF INTERPRETATION*

## Lynn M. Boughey**

> Men would be angels, angels would be gods,
> Aspiring to be gods, if angels fell,
> Aspiring to be angels, men rebel:
> And who but wishes to invert the laws
> Of order, sins against th' Eternal Cause.***

I. OVERVIEW OF THE STRUCTURE AND
   CONTENT OF THE PRESENT NORTH
   DAKOTA CONSTITUTION . . . . . . . . . . . . . . . . .   162
   A. Declaration of Rights . . . . . . . . . . . . . . . . . . . .   164
      1. *Rights Involving Criminal Law* . . . . . . . . . . . . . .   165

---

* 1987 by Lynn M. Boughey and the North Dakota Law Review. All rights reserved. This Article is intended to be the first in a series of articles on the North Dakota Constitution.

** Lynn Boughey is an attorney with the law firm of Pringle & Herigstad, Minot, North Dakota. North Dakota's first Truman Scholar, Lynn graduated from Grinnell College (B.A. 1979) and Hamline University School of Law (J.D. *cum laude* 1983). While attending Hamline he held the position of Articles Editor (1982-83) and Managing Editor (1983) of the Hamline Law Review. Following graduation, Lynn served as a law clerk to the Honorable Bruce M. Van Sickle, United States District Court Judge for the District of North Dakota (1983-85) and to the Honorable Gerald W. VandeWalle, North Dakota Supreme Court Justice (1985-86). [Ed]

I would like to thank the members of Pringle & Herigstad for their encouragement and support; Jan Sebby, Reagan Pufall, John and Carol Kapsner, Larry Remele, and Ken Horner for their editorial assistance; Professor Williams for his comments and suggestions; Rhonda Stiyer for typing the draft and making the many changes and corrections; and Nancy Soonpaa for conducting initial research.

Special thanks also goes to Judge Van Sickle and Justice VandeWalle, not only for giving me the wonderful opportunity to work with them, but for letting me observe firsthand their wisdom, brilliance, and compassion. But most especially, I thank my wife, Millie Francis. Every hour spent on this Article, and all other such endeavors, unfortunately represents an hour away from her. It is not possible to thank her enough for her support and encouragement, but I can at least give her these words: *ubi ea morietur, cape eam eamque minutatim in stellas conseca, et ea caeli aspectum tam decorum fingat, ut totus mundus noctem deamet neve speciosum veneretur solem.*

*** A. Pope, An Essay on Man epistle I, ll. 126-30 (1734).

## II. METHODS OF INTERPRETING THE NORTH DAKOTA CONSTITUTION

During the last ninety-eight years, the North Dakota Supreme Court has applied two opposing methods in its interpretation of the North Dakota Constitution, one based on the text of the constitution and the other based on the intent of those who adopted it.[441] The traditional method of construction employed by the court is a text based analysis in which the court looks first to the plain language of the document; only if an ambiguity exists does the court delve into the nontextual factors that demonstrate the object of the language and the intention of the people who drafted and adopted the particular provision.[442]

Despite the general acceptance of text based analysis in construing the constitution, the court has occasionally refused to apply this method of analysis and instead looked directly to the intent underlying the provision at issue.[443] The court's use of intent based analysis, however, normally has been consistent with the traditional text based analysis, either because the court's intent based interpretation of the constitution was consistent with the plain language of the text,[444] or because the language being construed was ambiguous and reference to the various nontextual factors was required in any event.[445] Nonetheless, the court's repeated, if not blithe, use of intent based analysis, without even an initial examination of the text or the acknowledgment of the existence of an ambiguity, has provided at least an ostensible foundation for the view that the intent underlying a constitutional provision has greater weight than the text itself.[446] This dubious foundation has been used by the North Dakota Supreme Court on at least three occasions, and as recently as 1979, as an excuse to ignore clear and specific constitutional language, thereby allowing

---

441. For a discussion of the two methods of constitutional interpretation, see *infra* text accompanying notes 448-653.

442. For a discussion of the text based method of constitutional interpretation, see *infra* text accompanying notes 448-567.

443. For a discussion of the intent based method of constitutional interpretation, see *infra* text accompanying notes 568-653.

444. For an example of the consistency between text based and intent based interpretation, see *infra* text accompanying notes 600-01.

445. For an example of intent based method of interpretation applied to ambiguous language, see *infra* text accompanying notes 598-99.

446. For an example of the court's use of the intent based method without an examination of the language under the text based method of interpretation, see *infra* text accompanying notes 580-97.

2.2

the court to negate the permanent law of North Dakota and the clearly expressed will of the people.[447]

The remainder of this Article contains an examination of the supreme court's two opposing methods of constitutional interpretation, a review of the tools employed by the supreme court to determine the intent underlying the North Dakota Constitution, and an analysis of the two methods of interpretation, along with a proposal for the development of a coherent and consistent system of constitutional interpretation.

## A. TEXT BASED ANALYSIS

The most cogent exposition of text based analysis is contained in *State ex rel. Linde v. Robinson.*[448] *Robinson* involved a request by the attorney general for a writ determining when the three newly elected justices of the supreme court (who were elected in 1916) were entitled to take office.[449] The dispute arose from a potential conflict between the text of the constitution, which provided that the first set of justices assumed office on the first Monday of December 1889, and held office until the conclusion of their respective terms,[450] and the previously enacted (and subsequently reenacted) statute, which provided that all state officers enter upon the duty of their offices on the first Monday in January following their election.[451] The three justices-elect argued that their terms of office commenced on the first Monday in December 1916, the anniversary of the election of the incumbent judges, while the defeated justices argued that the newly elected justices took office on the first Monday in January 1917, as provided by statute.[452] Because the three defeated justices and the two remaining incumbent justices withdrew from the case, the dispute fell to a panel of five district court judges acting as members of the supreme court.[453] The issue was hotly contested,[454] and the district court

447. For an example of the court's failure to consider clear and specific constitutional language, see *infra* text accompanying notes 603-53.

448. 35 N.D. 417, 160 N.W. 514 (1916).

449. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 419, 160 N.W. 514, 515 (1916).

450. *Id.* at 423-24, 160 N.W. at 517; *see also* N.D. CONST. art. IV, § 92 (1889) (repealed by art. amend. 97, Sept. 7, 1976).

451. *Robinson,* 35 N.D. at 422, 160 N.W. at 517; *see* COMPLIED LAWS § 1380 (1887).

452. 35 N.D. at 419-20, 160 N.W. at 515-16.

453. *Id.* at 419, 160 N.W. at 515. The final decision was rendered by four of the five appointed district court judges due to the unexplained absence of one of the district court judges. *Id.*

454. *See id.* at 430, 160 N.W. at 520. Indeed, Justice Robinson, one of the justices-elect, was referred to as a "revolutionary" by the panel of district judges because he stated in his oral argument before the court that the justices-elect "would put aside and render nugatory" the acts of the panel of district judges as well as those of the defeated court as of the date he believed their terms ended. *Id.*

judges were understandably thorough in their opinion and analysis. The court's decision, which held that the justices-elect did not take office until the first Monday in January,[455] is of little significance compared to the court's discussion of constitutional interpretation.

In its overview of the various rules of construction of the North Dakota Constitution, the court in *Robinson* quoted extensively from Judge Cooley's treatise on constitutional law:

> "*The object of construction,* as applied to a written Constitution, *is to give effect to the intent of the people adopting it.* In the case of all written laws it is the intent of the lawgiver that is to be enforced, *but this intent is to be found in the instrument itself. . . . The whole instrument is to be examined.* " "Every such instrument is adopted as a whole, and a clause which, standing by itself, might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law. It is therefore a very proper rule of construction that the whole is to be examined with a view to arriving at the true intention of each part." "The rule . . . is that *effect is to be given, if possible, to the whole instrument,* and to every section and clause. *If different portions seem to conflict, the courts must harmonize them, if practicable,* and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory." *The purpose to be accomplished* by the Constitution or any part of its several parts *should be considered,* and that will shed great light in construing such Constitution. "It is possible, however, that *after we have made use of all of the lights which the instrument itself affords, there may sill be doubts to clear up and ambiguities to explain.* " "*Among the aids* is a contemplation of *the object to be accomplished* or the mischief designed to be remedied or guarded against by the clause in which the ambiguity is met with. When we once know the reason which alone determines the will of the lawmakers, we ought to interpret and apply the words used in a manner suitable and consonant to that reason and as will be best calculated to effectuate the intent."
>
> "*The prior state of the law* will sometimes furnish the clue to the real meaning of the ambiguous provision, and it is especially important to look into it if the Constitution

455. *Id.* at 429, 160 N.W. at 519-20.

2.4

is the successor to another, and in the particular in question essential changes have apparently been made." And finally, as an elementary rule of construction, we note that which is drawn from *contemporaneous and practical constructions,* and "where there has been a practical construction which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which it is not easy to resist."[456]

The form of analysis enunciated in *Robinson* (as modified by its progeny, shown in brackets below) may be outlined out as follows:

*Preamble:*   The object of construction is to give effect to the intent of the people adopting it.

1. *Plain Language Controls:* The intent is to be found in the instrument itself.

2. *Harmonizing Rules:*
   a) The whole instrument is to be examined with a view to arriving at the true intention of each part;
   b) effect is to be given, if possible, to the whole instrument;
   c) if different portions seem to conflict, harmonize them if possible;
   d) when harmonizing lean in favor of construction which will render every word operative;
   [e) special language controls over more general language;][457] and
   [f) if a conflict still exists, apply the more recently adopted provision.][458]

3. *Construing Ambiguous Language:* If an ambiguity still exists, consider:
   a) the object to be accomplished;
   b) the prior state of the law, especially a predecessor constitution and any changes made; and
   c) contemporaneous and practical constructions, especially if acquiesced to for a considerable period.

456. *Id.* at 421-22, 160 N.W. at 516 (emphasis added) (quoting T. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS (7th ed. 1903) (quoting, sometimes inaccurately, various sections of chapter IV involving the construction of state constitutions)).

457. For an application of the rule that special language controls general language, see *infra* text accompanying note 483.

458. For an application of the rule that a more recently adopted provision controls a prior provision, see *infra* text accompanying note 484.

2.5

Under text based analysis, the preamble acts as a lodestar for the application of the ensuing rules. It serves only as a guide to direct the application of the rules, and not as a replacement for the rules. The proper function of the preamble is made clear first by the language of the preamble, which merely states that the *object* of the rules of construction is to give effect to the intention of the people adopting it, and also by the words immediately following the preamble. The very next sentence in *Robinson* provides that the intent is to be found in *the instrument itself.* After this reference to a direct examination of the document, the court lists specific rules concerning the review of the entire document, and then lists the nontextual factors to be employed *if* an ambiguity still exists. Thus, it is clear that the preamble acts mereley as a general guide to the application of the rules that follow, and that nontextual factors apply only after attempting to resolve the question of interpretation by reviewing the actual text of the constitution. It is this method of constitutional interpretation, and not a method based on intent, that the North Dakota Supreme Court consistently employed during the first twenty-five years of the court's construction of the North Dakota Constitution.[459] Although the court subsequently veered from this established path and occasionally fell victim to the allure of intent based analysis,[460] as well as the undifferentiated use of statutory rules of construction,[461] the court has usually employed traditional text based analysis.

### 1. Plain Language Controls

The primary rule of text based analysis is that in construing a constitutional provision the court looks first to the language of the constitution itself to determine its proper construction. The words contained in the constitution are to be given their plain, ordinary, and commonly understood meaning.[462] According to the North

459. *See* State *ex rel.* Miller v. Taylor, 22 N.D. 362, 368, 133 N.W. 1046, 1048 (1911) (text and context reviewed first before looking to other indicia of intent); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 34, 119 N.W. 360, 362 (1909) (deeming it "advisable" to first consider and determine the meaning of the words contained in the constitution before looking to the other indicia of intent); Doherty v. Ransom County, 5 N.D. 1, 4, 63 N.W. 148, 150 (1895) (using words of constitution to determine intent); State *ex rel.* Ohlquist v. Swan, 1 N.D. 5, 8, 44 N.W. 492, 493 (1890) (a construction of the constitution that is at variance with all past legislation, the declared wish of the voters, and the intent and expectation of the framers should not be reached "unless forced thereto by the clear rules of construction, or the obvious meaning of the language employed").

460. For a discussion of the court's use of intent based analysis, see *infra* text accompanying notes 570-653.

461. For a discussion of the court's use of statutory rules of construction, see *infra* text accompanying notes 551-62.

462. Verry v. Trenbeath, 148 N.W.2d 567, 574 (N.D. 1967); Cowl v. Wentz, 107 N.W.2d 697, 699 (N.D. 1961); Bronson v. Johnson, 76 N.D. 122, 124, 33 N.W.2d 819, 820 (1948); *see also* State v.

2.6

Dakota Supreme Court, courts "should aim to give effect to the purpose indicated by a fair interpretation of the language used."[463]

The supreme court has repeatedly stated that "the wording of the constitution" is to be applied.[464] In fact, in one of the court's earliest occasions to construe a state constitutional provision, it stated that a construction at variance with all past legislation on the subject, at variance with the declared wish of the voters, and at variance with the intent and expectation of the framers ought not to be reached *unless* such a construction was "forced" upon the court "by the clear rules of construction, or the obvious meaning of the language employed."[465] According to this statement, the plain language of the constitution and the rules of construction take precedence over both the apparent intent of the framers and the perceived desires of the voters. In the court's subsequent decisions, reference to the "clear rules of construction" language disappeared, leaving only the rule that the plain language controls.[466]

---

VandeHoven, 388 N.W.2d 857, 860 (N.D. 1986) (interpretation of speedy trial provision using plain terms of provision); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 107 (N.D. 1978) (must presume that words have been employed in their natural and ordinary meaning); Dawson v. Tobin, 74 N.D. 713, 730-31, 24 N.W.2d 737, 745 (1946) (must not look to extrinsic sources when language is clear and specific); Langer v. State, 69 N.D. 129, 163, 284 N.W. 238, 256 (1939) (language clear); State *ex rel.* Langer v. Olson, 44 N.D. 614, 628, 176 N.W. 528, 533 (1920) (direct and explicit language of provision); State *ex rel.* Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918) (plain and unmistakable language of provision used to determine the purpose and spirit of the provision manifest); State *ex rel.* Gaulke v. Turner, 37 N.D. 635, 669, 164 N.W. 924, 937 (1917) (must follow the clear import of constitutional language); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 373-74, 133 N.W. 1046, 1051 (1911) (must define words used in provisions in their popular sense).

463. State *ex rel.* Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918); *see also* Engstad v. Grand Forks County, 10 N.D. 54, 84 N.W. 577 (1900). In *Engstad,* the court stated that "[w]e are not at liberty to indulge in mere conjecture as to what was intended. Our duty is to fairly construe the language actually employed by the legislature, and from it determine the legislative intent." *Id.* at 58, 84 N.W. at 578.

464. Doherty v. Ransom County, 5 N.D. 1, 4, 63 N.W. 148, 150 (1895). *See generally* cases cited *infra* notes 467-77 (cases considering the words of the constitution in the first instance).

465. State *ex rel.* Ohlquist v. Swan, 1 N.D. 5, 11, 44 N.W. 492, 493 (1890).

466. *See* Haggard v. Meier, 368 N.W.2d 539, 541 (N.D. 1985) (when the constitutional provision is clear and unambiguous, the court should follow the text); McCarney v. Meier, 286 N.W.2d 780, 788 (N.D. 1979) (Erickstad, C.J., dissenting) (it is incumbent upon the court to recognize the change in the constitution and act accordingly); State *ex rel.* Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979) (questions must be answered, if possible, from the language of the provision itself); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978) (it is assumed that the framers of the constitution made a deliberate choice of words which reflected or expressed their thoughts); Tormaschy v. Hjelle, 210 N.W.2d 100, 102 (N.D. 1973) (questions must be answered, if possible, from language of the provision itself); Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965) (same); Dawson v. Tobin, 74 N.D. 713, 730-31, 24 N.W.2d 737, 745 (1946) (when there is no ambiguity, the court must accept the provision as it reads); Goughnour v. Brant, 47 N.D. 368, 371, 182 N.W. 309, 309-10 (1921) (the meaning and intention of the framers and the people adopting the constitution must be sought first of all in the language of the constitution itself); State *ex rel.* Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918) (purpose and spirit of provision is manifest by the language); State *ex rel.* Gaulke v. Turner, 37 N.D. 635, 668, 164 N.W. 924, 936 (1917) (the courts are not at liberty to declare an act void because of the "spirit" of the constitution unless this construction is necessarily implied from the express words of the constitution); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 368, 133 N.W. 1046, 1048 (1911) (the will of the people, as expressed by means of the ballot, should not be defeated by either a strained construction or a technical

2:7

The court has also repeatedly stated that it is to consider the words of the constitution first.[467] Any question must be answered, if possible, from the language of the provision itself,[468] and when no ambiguity exists, the court is compelled to accept the provision as it reads.[469] For example, the court has stated that ''it is improper for the courts to attempt to construe the provisions so as to legislate additional requirements or prescriptions which the words of the provisions do not themselves provide.''[470] The intent perceived by the court, even if correct, cannot be used to circumvent the express words of the constitution. The court is not justified in ''doing violence to the fair meaning of the words used'' in order to support an established legislative construction of the constitutional provision[471] or the apparent intent of the framers.[472] And although the court has recognized the imperfection of words as vehicles of expression,[473] the court has necessarily assumed ''that the framers of the constitution made a deliberate choice of words which reflected or expressed their thoughts.''[474]

The specific rule that the text of the constitution controls the construction is expressed most ably in the 1946 decision of *Dawson v. Tobin:*

''When the words of a man express his meaning plainly, distinctly, and perfectly there is no occasion to have

---

meaning); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 34, 119 N.W. 360, 362 (1909) (consider the words of the constitution first); Doherty v. Ransom County, 5 N.D. 1, 4, 63 N.W. 148, 150 (1895) (applying the applicable case law and the text of the constitution). For a discussion of the use of statutory rules of construction, see *infra* text accompanying notes 551-62.

467. *See, e.g.,* Goughnour v. Brant, 47 N.D. 368, 371, 182 N.W. 309, 309-10 (1921); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 34, 119 N.W. 360, 362 (1909). The court has, on occasion, stated merely that intention and purpose are to be found and deduced *primarily* from the text. *See* Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978); State v. Feist, 93 N.W.2d 646, 649 (N.D. 1958); Dawson v. Tobin, 74 N.D. 713, 730-31, 24 N.W.2d 737, 745 (1946). These statements, however, were made under the influence of intent based analysis. For a discussion of intent based analysis, see *infra* text accompanying notes 570-653.

468. State *ex rel.* Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979); Tormaschy v. Hjelle, 210 N.W.2d 100, 102 (N.D. 1973); Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965).

469. Dawson v. Tobin, 74 N.D. 713, 730-31, 24 N.W.2d 737, 745 (1946). The court has stated that it is not appropriate to use the spirit of the constitution to circumvent the express words of a particular constitutional provision. *See* State *ex rel.* Gaulke v. Turner, 37 N.D. 635, 668, 164 N.W. 924, 936 (1917).

470. Haggard v. Meier, 368 N.W.2d 539, 541 (N.D. 1985); *see also* McCarney v. Meier, 286 N.W.2d 780, 789 (N.D. 1979) (Erickstad, C.J., dissenting) (refusing to construe the constitution in a manner not consistent with the language of that document); Dawson v. Tobin, 74 N.D. 713, 730, 24 N.W.2d 737, 745 (1946) (court construing constitution is limited to the language of the constitution itself); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 368, 133 N.W. 1046, 1048 (1911) (no strained or technical meaning should be applied when construing constitution).

471. *See* State *ex rel.* Miller v. Taylor, 22 N.D. 362, 374, 133 N.W. 1046, 1051 (1911).

472. *See* McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979); State *ex rel.* Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 258-59, 49 N.W.2d 14, 21 (1951).

473. State *ex rel.* Lyons v. Guy, 107 N.W.2d 211, 217 (N.D. 1961) (quoting Meredith v. Kauffman, 293 Ky. 395, 398-99, 169 S.W.2d 37, 38-39 (1943)).

474. Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978).

2.8

recourse to any other means of interpretation. . . . The rule is sometimes stated more completely that a constitutional provision which is positive and free from all ambiguity must be accepted by the court as it reads. . . . In other words the courts are not at liberty to search for its meaning beyond the instrument, nor are they at liberty by a resort to the refinements of legal learning, to restrict an obvious meaning. Language which is plain and easily understood should be looked to without extrinsic aid for the meaning intended."[475]

As stated in *Goughnour v. Brant*, "[i]f the language is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is *conclusively presumed* to be the meaning intended to be conveyed."[476] The reason for this conclusive presumption is clear: the court recognizes that the constitution represents more than the subjective intent of the framers; this paramount law is the direct expression of the will of the people by means of the ballot, and it should not suffer impotency by either a strained construction or reverence of technical meanings.[477]

## 2. Harmonizing Rules

While continuing to use the harmonizing rules described in *Robinson,* the court has incorporated two additional rules to be applied if the attempt to harmonize the language fails. Since its earliest decisions, the North Dakota Supreme Court has construed the words contained in the constitution in the context of the whole constitution.[478] As stated in *Robinson* and its progeny, the whole instrument is to be examined with a view to arriving at the true intention of each part,[479] and effect is to be given, if possible, to the

---

475. Dawson v. Tobin, 74 N.D. 713, 730-31, 24 N.W.2d 737, 745 (1946) (footnotes omitted, emphasis added) (quoting 11 AM. JUR. *Constitutional Law* § 64, at 678-79 (1937)).

476. Goughnour v. Brant, 47 N.D. 368, 371, 182 N.W. 309, 309-10 (1921) (emphasis added).

477. *See* Haggard v. Meier, 368 N.W.2d 539, 541 (N.D. 1985); State *ex rel.* Gaulke v. Turner, 37 N.D. 635, 668, 164 N.W. 924, 936 (1917); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 368, 133 N.W. 1046, 1048 (1911).

478. *See* State *ex rel.* Linde v. Hall, 35 N.D. 34, 47, 159 N.W. 281, 286 (1916); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 368, 133 N.W. 1046, 1048 (1911); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 34-35, 119 N.W. 360, 362 (1909).

479. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421, 160 N.W. 514, 516 (1916); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 107 (N.D. 1978); State *ex rel.* Sanstead v. Freed, 251 N.W. 2d 898, 908 (N.D. 1977); State *ex rel.* City of Minot v. Gronna, 79 N.D. 673, 713, 59 N.W.2d 514, 540 (1953); Goughnour v. Brant, 47 N.D. 368, 371-72, 182 N.W. 309, 310 (1921); State *ex rel.* Germain v. Ross, 39 N.D. 630, 637, 170 N.W. 121, 124 (1918); *see* Tormaschy v. Hjelle, 210 N.W.2d 100, 103 (N.D. 1973) (construing one constitutional provision in relation to others); Abbey v. State, 202 N.W.2d 844, 853 (N.D. 1972) (same); State v. Feist, 93 N.W.2d 646, 649 (N.D. 1958)

whole instrument.[480] If different portions seem to conflict, they are to be harmonized if possible.[481] In harmonizing, the court is to lean in favor of a construction that will render every word operative.[482] The subsequent additions to the *Robinson* rules are: first, if a conflict still exists, special language controls over more general language;[483] and second, the more recently adopted provision controls.[484]

### 3. Construing Ambiguous Language

If an ambiguity remains after reviewing the text of the constitution and applying the harmonizing rules, the court may then broaden its scope of review beyond the "four corners" of the constitution. According to the supreme court, it is appropriate in construing the North Dakota Constitution to employ a wider field of inquiry than in the construction of legislative enactments.[485] Indeed, the court has stated that it actually has a duty to take judicial notice of the source of constitutional provisions.[486] In order to resolve an ambiguity, the court looks to the object to be accomplished, to the prior state of the law (including the origin of the provision), and to contemporaneous and practical constructions.[487]

---

(same); State *ex rel.* Langer v. Olson, 44 N.D. 614, 628-29, 176 N.W. 528, 533 (1920) (same); *see also* Northwestern Bell Tel. Co. v. Wentz, 103 N.W.2d 245, 252 (N.D. 1960) (entire section construed as whole).

480. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421, 160 N.W. 514, 516 (1916); McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 107 (N.D. 1978); State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 908 (N.D. 1977); State *ex rel.* Morris v. Sherman, 63 N.D. 9, 20, 245 N.W. 877, 882 (1932); State *ex rel.* Germain v. Ross, 39 N.D. 630, 637, 170 N.W. 121, 124 (1918).

481. McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 107 (N.D. 1978); State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 908 (N.D. 1977); State *ex rel.* Lein v. Sathre, 113 N.W.2d 679, 683 (N.D. 1962); Great N. Ry. v. Duncan, 42 N.D. 346, 353, 176 N.W. 992, 995 (1919); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421, 160 N.W. 514, 516 (1916); *see* State v. Rivinius, 328 N.W.2d 220, 229 (N.D. 1982); State *ex rel.* Walker v. Link, 232 N.W.2d 823, 825, 826 (N.D. 1975); State *ex rel.* Germain v. Ross, 39 N.D. 630, 637, 170 N.W. 121, 124 (1918).

482. State *ex rel.* Germain v. Ross, 39 N.D. 630, 637, 170 N.W. 121, 124 (1918); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421, 160 N.W. 514, 516 (1916); *see* State *ex rel.* Morris v. Sherman, 63 N.D. 9, 20-21, 245 N.W. 877, 882 (1932).

483. State *ex rel.* Walker v. Link, 232 N.W.2d 823, 826 (N.D. 1975).

484. *Id.;* State *ex rel.* Paulson v. Meier, 127 N.W.2d 665, 673 (N.D. 1964); State *ex rel.* Lein v. Sathre, 113 N.W.2d 679, 683 (N.D. 1962); *see* Egbert v. City of Dunseith, 74 N.D. 1, 6, 24 N.W.2d 907, 909 (1946); Dawson v. Tobin, 74 N.D. 713, 726-27, 24 N.W.2d 737, 743 (1946); State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 911-12 (N.D. 1977) (Vogel, J., dissenting) (arguing that the more recently adopted provision should prevail).

485. State *ex rel.* Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979); Tormaschy v. Hjelle, 210 N.W.2d 100, 102 (N.D. 1973); Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965) (citing State *ex rel.* Linde v. Hall, 35 N.D. 34, 47, 159 N.W. 281, 286 (1916)).

486. State *ex rel.* Linde v. Hall, 35 N.D. 34, 48, 159 N.W. 281, 286 (1916).

487. *See, e.g.,* State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421-22, 160 N.W. 514, 516 (1916).

NORTH DAKOTA LAW REVIEW          [VOL. 63:157

### a) The Object to Be Accomplished

In determining the object to be accomplished, the court attempts to discover the intent of the "constitution makers,"[488] the intent of the members of the constitutional convention,[489] the intent of the people adopting the constitutional provision,[490] and the purpose[491] and spirit[492] of the provision being construed. Although the framers' and the people's intent in adopting a provision are not controlling, these intentions are "proper subjects of consideration when courts are attempting to arrive at the meaning of ambiguous language in a statute or Constitution."[493] The court employs various sources to determine intent and purpose, including the journal[494] and the debates[495] of the constitutional convention at

488. Roesler v. Taylor, 3 N.D. 546, 548, 58 N.W. 342, 343 (1894).

489. Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978); State ex rel. Stockman v. Anderson, 184 N.W.2d 53, 56-57 (N.D. 1971); Permann v. Knife River Coal Mining Co., 180 N.W.2d 146, 160 (N.D. 1970), overruled on other grounds sub nom., Haag v. State, 219 N.W.2d 121, 130 (N.D. 1974); Newman v. Hjelle, 133 N.W.2d 549, 555 (N.D. 1965); State v. Feist, 93 N.W.2d 646, 649-50 (N.D. 1958); Kessler v. Thompson, 75 N.W.2d 172, 181 (N.D. 1956); State v. Lohnes, 69 N.W.2d 508, 513 (N.D. 1955); State ex rel. Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 258-59, 49 N.W.2d 14, 21 (1951); State ex rel. Johnson v. Baker, 74 N.D. 244, 257, 21 N.W.2d 355, 363 (1946); Langer v. State, 69 N.D. 129, 154-55, 284 N.W. 238, 252 (1939); State v. Norton, 64 N.D. 675, 685-86, 255 N.W. 787, 792 (1934); Becker County Sand & Gravel Co. v. Wosick, 62 N.D. 740, 750, 245 N.W. 454, 456 (1932); Power v. Williams, 3 N.D. 54, 62-63, 205 N.W. 9, 12 (1925); Goughnour v. Brant, 47 N.D. 368, 371, 182 N.W. 309, 309-10 (1921); State ex rel. Germain v. Ross, 39 N.D. 630, 637-38, 170 N.W. 121, 124 (1918); State ex rel. Miller v. Taylor, 22 N.D. 362, 369, 133 N.W. 1046, 1049 (1911); Barry v. Truax, 13 N.D. 131, 137, 99 N.W. 769, 771 (1904); Doherty v. Ransom County, 5 N.D. 1, 4, 63 N.W. 148, 149 (1895); State ex rel. Ohlquist v. Swan, 1 N.D. 5, 11, 44 N.W. 492, 493 (1890).

490. Jensen v. State, 373 N.W.2d 894, 897 (N.D. 1985); McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 107 (N.D. 1978); State ex rel. Vogel v. Garaas, 261 N.W.2d 914, 918 (N.D. 1978); State ex rel. Stockman v. Anderson, 184 N.W.2d 53, 56-57 (N.D. 1971); Newman v. Hjelle, 133 N.W.2d 549, 555 (N.D. 1965); State ex rel. Lein v. Sathre, 113 N.W.2d 679, 684 (N.D. 1962); State ex rel. Lyons v. Guy, 107 N.W.2d 211, 217 (N.D. 1961); Northwestern Bell Tel. Co. v. Wentz, 103 N.W.2d 245, 252-53 (N.D. 1960); State ex rel. Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 258, 49 N.W.2d 14, 21 (1951); Egbert v. City of Dunseith, 74 N.D. 1, 7, 24 N.W.2d 907, 909 (1946); State v. Norton, 64 N.D. 675, 685-86, 255 N.W. 787, 792 (1934); State ex rel. Morris v. Sherman, 63 N.D. 9, 17, 245 N.W. 877, 880 (1932); Power v. Williams, 53 N.D. 54, 62, 205 N.W. 9, 12 (1925); Goughnour v. Brant, 47 N.D. 368, 371, 182 N.W. 309, 309-10 (1921); State ex rel. Germain v. Ross, 39 N.D. 630, 637-38, 170 N.W. 121, 124 (1918); State ex rel. Miller v. Taylor, 22 N.D. 362, 369, 133 N.W. 1046, 1049 (1911); Barry v. Truax, 13 N.D. 131, 137, 99 N.W. 769, 771 (1904); State ex rel. Ohlquist v. Swan, 1 N.D. 5, 11, 44 N.W. 492, 493 (1890).

491. McCarney v. Meier, 286 N.W.2d 780, 786 (N.D. 1979); Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965); State ex rel. Lein v. Sathre, 113 N.W.2d 679, 684 (N.D. 1962); State ex rel. Lyons v. Guy, 107 N.W.2d 211, 217 (N.D. 1961); Northwestern Bell Tel. Co. v. Wentz, 103 N.W.2d 245, 255 (N.D. 1960); Kessler v. Thompson, 75 N.W.2d 172, 184-85 (N.D. 1956); Goughnour v. Brant, 47 N.D. 368, 372, 182 N.W. 309, 310 (1921); Great N. Ry. v. Duncan, 42 N.D. 346, 358, 176 N.W. 992, 997 (1919); State ex rel. Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918); State ex rel. Linde v. Robinson, 35 N.D. 417, 421, 160 N.W. 514, 516 (1916); State ex rel. Morris v. Blaisdell, 18 N.D. 31, 39, 119 N.W. 360, 364 (1909).

492. State ex rel. Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918); State ex rel. Miller v. Taylor, 22 N.D. 362, 373, 133 N.W. 1046, 1051 (1911).

493. State ex rel. Miller v. Taylor, 22 N.D. 362, 369, 371, 133 N.W. 1046, 1049, 1050 (1911).

494. Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 108-09 (N.D. 1978); State ex rel. Miller v. Taylor, 22 N.D. 362, 369, 133 N.W. 1046, 1049 (1911).

495. See Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978); State ex rel. Vogel v. Garaas, 261 N.W.2d 914, 920 (N.D. 1978); State ex rel. Sanstead v. Freed, 251 N.W.2d

2.11

which the provision was drafted, the history of the convention,[496] and the general history of the state,[497] including descriptions of state history contained in law review articles.[498] Even newspaper articles[499] and editorials[500] are reviewed by the court to evaluate the intent of the framers and the people. Indeed, the court has stated that *all* facts which form the background of the adoption of a particular provision may be considered in determing intent.[501]

When construing ambiguous language, and especially constitutional language that is inherently ambiguous, such as the general standards that serve as the backbone of state constitutional rights,[502] it is appropriate to take into account the early history of

898, 905 (N.D. 1977); Abbey v. State, 202 N.W.2d 844, 853 (N.D. 1972); Permann v. Knife River Coal Mining Co.,, 180 N.W.2d 146, 160 (N.D. 1970), *overruled on other grounds sub nom.*, Haag v. State, 219 N.W.2d 121, 130 (N.D. 1974); State *ex rel.* Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 258-59, 49 N.W.2d 14, 21-22 (1951); State *ex rel.* Johnson v. Baker, 74 N.D. 244, 257-58, 21 N.W.2d 355, 363 (1946); Langer v. State, 69 N.D. 129, 153-55, 284 N.W. 238, 251 (1939); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 425, 160 N.W. 514, 518 (1916); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 369, 133 N.W. 1046, 1049 (1911).

496. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 425, 160 N.W. 514, 518 (1916); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 369, 133 N.W. 1046, 1049 (1911); State *ex rel.* Ohlquist v. Swan, 1 N.D. 5, 10-11, 44 N.W. 492, 493 (1890).

497. State *ex rel.* Vogel v. Garaas, 261 N.W.2d 914, 920 (N.D. 1978); State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 905-07 (N.D. 1977); State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971); Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965); State v. Lohnes, 69 N.W.2d 508, 512-13 (N.D. 1955); State *ex rel.* City of Minot v. Gronna, 79 N.D. 673, 684, 59 N.W.2d 514, 524 (1953); Egbert v. City of Dunseith, 74 N.D. 1, 9-11, 24 N.W.2d 907, 910-11 (1946); State v. Norton, 64 N.D. 675, 681, 255 N.W. 787, 790 (1934); State *ex rel.* Reese v. Mooney, 64 N.D. 620, 624, 255 N.W. 105, 107 (1934); State *ex rel.* Morris v. Sherman, 63 N.D. 9, 15, 245 N.W. 877, 880 (1932); Baird v. Burke County, 53 N.D. 140, 150, 205 N.W. 17, 19 (1925); Power v. Williams, 53 N.D. 54, 61-63, 205 N.W. 9, 12-13 (1925); Great N. Ry. v. Duncan, 42 N.D. 346, 357-58, 176 N.W. 992, 997 (1919); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 428, 160 N.W. 514, 518-19 (1916); State *ex rel.* Linde v. Hall, 35 N.D. 34, 47, 159 N.W. 281, 286 (1916); State *ex rel.* Miller v. Taylor, 22 N.D. 362, 370-71, 133 N.W. 1046, 1049-50 (1911); Barry v. Truax, 13 N.D. 131, 138-39, 99 N.W. 769, 771 (1904); State *ex rel.* Ohlquist v. Swan, 1 N.D. 5, 10-11, 44 N.W. 492, 493 (1890).

498. State *ex rel.* Vogel v. Garaas, 261 N.W.2d 914, 920 n.1 (N.D. 1978) (citing Kuhns, *Revising a State Judicial Article: Issues for the North Dakota Constitutional Convention*, 48 N.D.L. REV. 217, 238-40 (1972); Note, *Judicial Selection in North Dakota — Is Constitutional Revision Necessary?*, 48 N.D.L. REV. 327 (1972) (authored by John W. Dwyer)).

499. State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 907 (N.D. 1977) (relying on an article in the Bismarck Tribune in deciding whether the North Dakota Constitution prohibits the lieutenant governor from casting a tie-breaking vote on the final consideration of a state senate bill).

500. Newman v. Hjelle, 133 N.W.2d 549, 556-57 (N.D. 1965) (citing McKenzie County v. Lamb, 70 N.D. 782, 298 N.W. 241 (1941) (relying on a publication of the North Dakota County Commissioners' Association in discussing the appropriation of revenue for highway purposes).

501. State *ex rel.* Vogel v. Garaas, 261 N.W.2d 914, 920 (N.D. 1978); State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971).

502. *See, e.g.*, N.D. CONST. art. I, § 8 (prohibiting unreasonable searches and seizures); *id.* art. I, § 11 (requiring sufficient sureties and guarantee against excessive bail, excessive fines, and cruel or unusual punishments); *id.* art. I, § 12 (requiring a speedy and public trial, and due process of law); *id.* art. I, § 16 (requiring just compensation when private property is taken); *id.* art. VI, § 2 (providing that the supreme court has original jurisdiction over writs necessary to properly exercise the supreme court's jurisdiction); *id.* art. VI, § 8 (providing that the district court has authority to issue writs necessary to properly exercise the district court's jurisdiction); *id.* art. VIII, § 1 (providing that schools are to be free from sectarian control); *id.* art. VIII, § 2 (requiring uniform system of free public schools); *id.* art. VIII, § 3 (requiring that in all schools instruction will be given "as far as

2.12

North Dakota (including the history surrounding the constitutional convention), the intentions of the constitutional framers (shown primarily by the debates of the constitutional convention), and the differences between the federal and North Dakota constitutions. Because the court considers the object to be accomplished when applying both text based analysis (after finding an ambiguity) and intent based analysis, the factors employed to determine the underlying object are discussed in Part III of this Article.

### b) The Prior State of the Law

In determining the prior state of the law, the court may look to: (1) the traditional common law;[503] (2) prior statutory law,[504] including territorial law[505] and, when applicable, prior federal law;[506] and (3) predecessor constitutional provisions upon which a North Dakota constitutional provision is based,[507] including the prior North Dakota constitutional provision when interpreting an amended provision,[508] and the federal constitution when interpreting a provision added to the North Dakota Constitution based on the federal constitution.[509]

---

practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind"); *id.* art. VIII, § 4 (requiring the legislature "take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity, and to promote industrial, scientific, and agricultural improvements"); *id.* art. IX, § 11 (requiring the legislature to "pass suitable laws for the safekeeping, transfer, disbursement of state school funds"); *id.* (requiring the legislature to require officers handling state school funds to give ample bonds); *id.* art. X, § 5 (providing for uniform taxes upon the same class of property); *id.* art. XI, § 3 (requiring that flowing streams and natural water courses remain the property of the state); *id.* art. XI, § 6 (providing for the right of inspection of public records during reasonable office hours); *id.* art. XI, § 22 (providing a debtor the right "to enjoy the comforts and necessaries of life recognized by wholesome laws"); *id.* art. XIII, § 1, subd. 1 (requiring "[p]erfect toleration of religious sentiment").

503. *See, e.g.,* Barry v. Truax, 13 N.D. 131, 139-40, 99 N.W. 769, 772 (1904); *see also* State *ex rel.* Morris v. Sherman, 63 N.D. 9, 18-19, 245 N.W. 877, 881 (1932) (common law reviewed, but not applicable).

504. *See, e.g.,* State *ex rel.* Vogel v. Garaas, 261 N.W.2d 914, 920 (N.D. 1978).

505. *See, e.g.,* id.; Power v. Williams, 53 N.D. 54, 61, 205 N.W. 9, 12 (1925); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 38-40, 119 N.W. 360, 364-65 (1909); Barry v. Truax, 13 N.D. 131, 138, 99 N.W. 769, 771 (1904).

506. *See, e.g.,* Newman v. Hjelle, 133 N.W.2d 549, 558 (N.D. 1965).

507. State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 904 (N.D. 1977); Johnson v. Hassett, 217 N.W.2d 771, 774 (N.D. 1974); State *ex rel.* Lyons v. Guy, 107 N.W.2d 211, 218 (N.D. 1961); State v. Lohnes, 69 N.W.2d 508, 514 (N.D. 1955); Becker County Sand & Gravel Co. v. Wosick, 62 N.D. 740, 756-57, 765-66, 245 N.W. 454, 459, 463 (1932); State v. First State Bank, 52 N.D. 231, 254-55, 202 N.W. 391, 400-01 (1924); State *ex rel.* Twichell v. Hall, 44 N.D. 459, 464-65, 171 N.W. 213, 215 (1918); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 422, 160 N.W. 514, 516 (1916); State *ex rel.* Linde v. Hall, 35 N.D. 34, 48-53, 159 N.W. 281, 287-89 (1916); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 42-43, 119 N.W. 360, 365-66 (1909).

508. *See, e.g.,* Goughnour v. Brant, 47 N.D. 368, 372, 182 N.W. 309, 310 (1921).

509. *See, e.g.,* State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 908 (N.D. 1977); Power v. Williams, 53 N.D. 54, 61, 205 N.W. 9, 12 (1925); Barry v. Truax, 13 N.D. 131, 137, 99 N.W. 769, 771 (1904).

In one of the court's earliest decisions, the North Dakota Supreme Court stated that the constitution "shall be held to be prepared and adopted in reference to existing statutory laws"[510] and that the courts "are bound to presume that the people adopting a constitution are familiar with the previous and existing laws upon the subjects to which its provisions relate. . . ."[511] As stated above, the court has declared that it has a duty to take judicial notice of the source of the constitutional provision that is being interpreted.[512] And, according to one decision, the court will explore the "form in which the idea has been fashioned in other states"[513] and consider the history and experience of other states that have adopted similar principles.[514]

In interpreting an ambiguous provision based on a preexisting constitutional provision, special emphasis is placed on the text of the preceding constitution and any changes made to that text.[515] When a constitutional provision is drawn verbatim from another state's constitution, that state's construction of its own constitution *prior to* the adoption of the provision by North Dakota is presumed to be included within the adoption of the new provision.[516] That state's construction, however, is not necessarily conclusive upon the North Dakota Supreme Court, and the court is free to disregard the other state's construction, although it does not do so lightly.[517] In addition, the differences in language between a predecessor constitution and the North Dakota Constitution are given great weight.[518]

When using predecessor constitutions to determine intent, it is often very difficult to determine which constitution was used as a basis for the North Dakota constitutional provision. This determination is especially difficult because the delegates to the

510. Barry v. Truax, 13 N.D. 131, 139, 99 N.W. 769, 771 (1904) (quoting People *ex rel.* Jackson v. Potter, 47 N.Y. 375 (1872)).

511. *Id.*

512. State *ex rel.* Linde v. Hall, 35 N.D. 34, 48, 159 N.W. 281, 286 (1916).

513. *Id.* (quoting State *ex rel.* Blakeslee v. Clausen, 85 Wash. 260, 148 P. 28 (1915)).

514. *Id.; see also* State *ex rel.* Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979) (North Dakota Supreme Court considered similar language of the New Mexico Constitution when interpreting the North Dakota Constitution); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 109-13 (N.D. 1978) (considering the similar language of various other state's constitutions).

515. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 422, 160 N.W. 514, 516 (1916).

516. *See, e.g.,* Becker County Sand & Gravel Co. v. Wosick, 62 N.D. 740, 766, 245 N.W. 454, 463 (1932); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 42, 119 N.W. 360, 365 (1909). For a discussion of the argument that the interpretation of a state constitutional provision based on the federal constitution is limited to the present federal interpretation, see *infra* text accompanying notes 870-76.

517. *See, e.g.,* State *ex rel.* Twichell v. Hall, 44 N.D. 459, 465, 171 N.W. 213, 215 (1918).

518. For a list of cases that have looked to other states' constructions, see *supra* note 507. Common sense dictates that any changes made upon a predecessor constitutional provision by the framers of the North Dakota Constitution were made for a reason, and that the more extensive the changes, the less persuasive the preexisting interpretation of the other state's constitution.

2.14

constitutional convention had access to the constitutions of every state then in the Union, as well as personal copies of the proposed South Dakota Constitution.[519] Adding to this difficulty are the various changes made over the years to each of the constitutions of the other states. The converse problem develops in determining whether another state's present constitution — which is now similar or even identical to the North Dakota Constitution — was similarly worded in 1889, or, in the alternative, subsequently infused with the language contained in the North Dakota Constitution. These problems can be overcome only by expending large amounts of time in the review of the appropriate materials.[520] It is therefore no wonder that the court, although reneging on its self-proclaimed duty to take judicial notice of the source of the relevant constitutional provision,[521] often side steps this prong of the *Robinson* analysis and bases its interpretation of ambiguous provisions either on the apparent intent of the framers or on the contemporaneous construction of the legislature or some other governmental body.

### c) Contemporaneous and Practical Constructions

The North Dakota Supreme Court has long held that a contemporaneous and practical construction of the North Dakota Constitution is relevant to the proper interpretation of that document, especially when "there has been a practical construction which has been acquiesced in for a considerable period. . . ."[522] These factors, however, should be employed as the last means of determining the proper interpretation of a constitutional provision. Unlike the preceding steps in the *Robinson* analysis, a contemporaneous and practical construction of the constitution necessarily reflects a *subsequent* understanding of an already adopted constitutional provision, thereby providing less indication of the framers' and the people's intent underlying the adoption of that provision.

---

519. For a discussion of the information the delegates had before them, see *infra* text accompanying notes 687-88.

520. Perhaps the future editors of the *North Dakota Law Review* would be willing to undertake a special project, tracing the origin of each provision of the North Dakota Constitution through the Journal of the convention (making note of all changes made or attempted to be made of the language) and discovering the possible origin of each provision. Such a work would be an invaluable aid to the lawyers and judges of the state, and would be a fitting gift to the bar on the occasion of the centennial of the North Dakota Constitution.

521. State *ex rel.* Linde v. Hall, 35 N.D. 34, 48, 159 N.W. 281, 286 (1916).

522. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 422, 160 N.W. 514, 516 (1916) (quoting T. Cooley, A Treatise on the Constitutional Limitations (7th ed. 1903) (quoting, sometimes inaccurately, various sections of chapter IV involving the construction of state constitutions)).

A contemporaneous interpretation of a constitutional provision can be drawn from many sources, including subsequent legislative enactments,[523] revisions by code commissions, or the lack of a revision,[524] votes at a statewide election,[525] and even custom.[526] Moreover, contemporaneous construction is not limited to constructions by the legislature or the people: constructions by the executive or judicial departments, as well as other governmental agencies, may be considered.[527] Of special significance in determining the intent underlying the original provisions of the North Dakota Constitution is the legislation enacted by the first legislative assembly, for "many members of the first legislative assembly were men who had participated actively in the framing of the constitution. . . ."[528]

A "practical" interpretation of the North Dakota Constitution generally relates to the court's own judgment of whether the result is absurd,[529] undesirable,[530] impractical,[531] or unreasonable.[532] As may be expected, there may be differences in opinion on whether the result is actually absurd. And even if the result seems presently absurd, the particular result may not have seemed absurd to those who adopted the provision, and may accurately reflect what was originally intended regardless of the alleged absurdity. In any event, the practical interpretation analysis occasionally has been used as an excuse to ignore the text of the constitution and to reach

523. State ex rel. Sanstead v. Freed, 251 N.W.2d 898, 905-06 (N.D. 1977); State ex rel. Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971); Newman v. Hjelle, 133 N.W.2d 549, 557-58 (N.D. 1965); State ex rel. Lyons v. Guy, 107 N.W.2d 211, 216-17 (N.D. 1961); State ex rel. Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 258-59, 49 N.W.2d 14, 21 (1951); Egbert v. City of Dunseith, 74 N.D. 1, 9-11, 24 N.W.2d 907, 910-11 (1946); State ex rel. Johnson v. Baker, 74 N.D. 244, 258, 21 N.W.2d 355, 363 (1945); Langer v. State, 69 N.D. 129, 138-41, 284 N.W. 238, 243-44 (1939); State ex rel. Twichell v. Hall, 44 N.D. 459, 465-67, 171 N.W. 213, 215-16 (1918); State ex rel. Linde v. Robinson, 35 N.D. 417, 425-26, 160 N.W. 514, 518-19 (1916); State ex rel. Linde v. Hall, 35 N.D. 34, 48-49, 159 N.W. 281, 286-87 (1916); State ex rel. Miller v. Taylor, 22 N.D. 362, 371, 133 N.W. 1046, 1050 (1911); State ex rel. McCue v. Blaisdell, 18 N.D. 31, 38-39, 119 N.W. 360, 364 (1909); Barry v. Truax, 13 N.D. 131, 139, 99 N.W. 769, 771 (1904).
524. Barry v. Truax, 13 N.D. 131, 139, 99 N.W. 769, 771 (1904).
525. State ex rel. Miller v. Taylor, 22 N.D. 362, 371, 133 N.W. 1046, 1050 (1911).
526. See, e.g., State ex rel. Lyons v. Guy, 107 N.W.2d 211, 216 (N.D. 1961).
527. State ex rel. Twichell v. Hall, 44 N.D. 459, 465, 171 N.W. 213, 215-16 (1918).
528. State ex rel. Johnson v. Baker, 74 N.D. 244, 258, 21 N.W.2d 355, 363 (1945).
529. Haugland v. Meier, 339 N.W.2d 100, 105 (N.D. 1983); State ex rel. Olson v. Baaken, 329 N.W.2d 575, 578 (N.D. 1983); State ex rel. Lein v. Sathre, 113 N.W.2d 679, 684 (N.D. 1962).
530. State ex rel. Olson v. Baaken, 329 N.W.2d 575, 578 (N.D. 1983).
531. See, e.g., State ex rel. Reese v. Mooney, 64 N.D. 620, 625, 255 N.W. 105, 107 (1934).
532. See, e.g., State ex rel. Lein v. Sathre, 113 N.W.2d 679, 684 (N.D. 1962); State v. Feist, 93 N.W.2d 646, 649 (N.D. 1958); State ex rel. Rausch v. Amerada Petroleum Corp., 78 N.D. 247, 260-61, 49 N.W.2d 14, 22 (1951); see also State ex rel. Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979) (court may consider the consequences of a particular construction when an ambiguity exists in the constitution); Cardiff v. Bismarck Pub. School Dist., 263 N.W.2d 105, 113 (N.D. 1978) (court may resolve a basic constitutional question primarily on the language found in the constitutional provision).

a desired result, even if that result is at odds with the clear language of the constitution.[533]

In reference to the length of the acquiescence, the court has not been specific about what constitutes a "considerable period" of acquiescence to a legislative or practical construction.[534] In applying this doctrine, the court refers to a "long-continued" construction (consisting of eighty-five years),[535] as well as an "established" construction of a "very long continuance."[536] The court has also described certain contemporaneous and practical constructions as lasting "years" (fourteen years),[537] "a period of years" (nineteen years[538] and fourteen years[539]), "many years" (unspecified number of years),[540] and for a "considerable period" (twenty-six years).[541]

The court has also offered varying descriptions of the weight to be afforded to a contemporaneous or practical construction receiving acquiescence for a considerable period. The court has stated that a contemporaneous and practical construction "is not easy to resist"[542] and is entitled to great weight in determining the real intent and purpose of constitutional provisions and requirements.[543] According to the court, these constructions "tend to show the understanding of the people on the subject, and are proper subjects of consideration when courts are attempting to arrive at the meaning of ambiguous language in a statute or

---

533. *See, e.g.,* McCarney v. Meier, 286 N.W.2d 780 (N.D. 1979); State *ex rel.* Lein v. Sathre, 113 N.W.2d 679 (N.D. 1962); State *ex rel.* Twichell v. Hall, 44 N.D. 459, 171 N.W. 213 (1918). For a discussion of these cases, see *infra* text accompanying notes 603-53.

534. *See, e.g.,* State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971) (14 years); State *ex rel.* Linde v. Robinson, 35 N.D. 417, 422, 160 N.W. 514, 516 (1916) (26 years).

535. State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 905 (N.D. 1977).

536. State *ex rel.* Miller v. Taylor, 22 N.D. 362, 374, 133 N.W. 1046, 1051 (1911) (stating that the construction of two legislative assemblies is not an established construction, but may be used, in conjunction with a subsequent vote of the people, as an indication of the meaning of the provision).

537. State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971).

538. State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 38-39, 119 N.W. 360, 364 (1909).

539. Barry v. Truax, 13 N.D. 131, 138, 99 N.W. 769, 771 (1904).

540. State *ex rel.* Lyons v. Guy, 107 N.W.2d 211, 216 (N.D. 1961).

541. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 422, 160 N.W. 514, 516 (1916).

542. *Id.* at 422, 428, 160 N.W. at 516, 519 (quoting T. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS (7th ed. 1903) (quoting, sometimes inaccurately, various sections of chapter IV involving the construction of state constitutions)).

543. *Id.* at 428, 160 N.W. at 519; *see also* State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971) (the construction that the legislature has placed on a constitutional provision, followed by years of subsequent legislation, is entitled to great weight); State *ex rel.* Linde v. Packard, 35 N.D. 298, 322, 160 N.W. 150, 156 (1916) (contemporaneous construction and interpretation given by the legislature is entitled to a great deal of weight); State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 39, 119 N.W. 360, 364 (1909) (when legislative construction has been followed by harmonious subsequent legislation that has been in effect for years, the legislative construction is entitled to great weight in determining the intent of constitutional provisions); Barry v. Truax, 13 N.D. 131, 139, 99 N.W. 769, 771 (1904) (recommendations of persons familiar with previous legislation of the state is entitled to great weight in any contemporaneous construction).

Constitution."[544] The court has also stated that a contemporaneous or practical construction "should not be departed from unless manifestly erroneous"[545] and that such a construction "is entitled to great weight, unless it can be said to be a clear usurpation of power or an abrogation of the text."[546] On the other hand, the court has also declared that a contemporaneous or practical construction "is not controlling"[547] and "is not necessarily binding on the courts."[548]

Although a practical or contemporaneous construction may be considered by the court in interpreting the constitution, these constructions should not serve as a pretext to disregard the text of the constitution or to create an ambiguity when none exists. The court has often stated that the "rules of expediency" have no application in construing the constitution, and that the court is obligated to follow the plain mandates of the constitution irrespective of "public clamor, majority desire, present apparent need, . . . [or] unreasonableness of constitutional provisions as particularly applied."[549] But, as will be shown, the court has occasionally failed to heed its own words.[550]

### 4. *Application of Statutory Rules of Construction*

In one of its earliest decisions interpreting the North Dakota Constitution, the North Dakota Supreme Court alluded to "the clear rules of construction,"[551] but did not state whether it was referring to constitutional or statutory rules of construction. Apparently the court was referring to constitutional rules of construction, for in its decisions immediately following this broad reference the court elaborated on the rules of constitutional construction while omitting reference to rules of statutory construction.[552]

---

544. State *ex rel.* Miller v. Taylor, 22 N.D. 362, 371, 133 N.W. 1046, 1050 (1911).
545. State *ex rel.* Linde v. Packard, 35 N.D. 298, 322, 160 N.W. 150, 156 (1916).
546. State *ex rel.* Miller v. Taylor, 22 N.D. 362, 374, 133 N.W. 1046, 1051 (1911).
547. *Id.* at 371, 133 N.W. at 1050.
548. State *ex rel.* McCue v. Blaisdell, 18 N.D. 31, 38, 119 N.W. 360, 364 (1909).
549. State *ex rel.* Langer v. Olson, 44 N.D. 614, 630, 176 N.W. 528, 534 (1920); *see also* McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979) (courts must follow plain mandates of constitution regardless of "public clamor, majority desire, or apparent need"); R. RUSSELL, MR. DOOLEY'S OPINIONS 26 (1906) ("[n]o matter whether th' constitution follows th' flag or not, th' supreme court follows th' iliction returns").
550. For a discussion of instances when the court has deviated from the plain mandates of the constitution, see *infra* text accompanying notes 568- 653.
551. State *ex rel.* Ohlquist v. Swan, 1 N.D. 5, 11, 44 N.W. 492, 493 (1890).
552. For examples of cases in which the court elaborates on constitutional construction but not statutory construction, see *supra* note 466.

2.18

The rules of constitutional construction, described at length in *State ex rel. Linde v. Robinson,*[553] serve as the foundation of the court's interpretation of the North Dakota Constitution.[554] At least in part, the traditional rules of constitutional construction parallel the statutory rules of construction.[555] Because of these similarities, the court has often stated that the rules of statutory construction may, to a limited extent, be applied to the interpretation of the constitution: ''Generally speaking, principles of construction applicable to statutes are also applicable to constitutions, but not to the extent of defeating the purposes for which a constitution is drawn.''[556] When interpreting the constitution, the court has occasionally refered to a statutory rule of construction instead of the constitutional rules of construction delineated in *Robinson*. The rules of statutory construction are normally used only as a quick reference to the corresponding constitutional rules of construction, and should not be construed as a wholesale adoption of the statutory rules of construction in the interpretation of the North Dakota Constitution.[557] In one decision the court abbreviated the statement regarding the *general* application of the *principles* of statutory construction in the interpretation of the state constitution, and simply stated that ''rules applicable to construction of statutes

553. State *ex rel.* Linde v. Robinson, 35 N.D. 417, 421-22, 160 N.W. 514, 516 (1916). For a discussion of *Robinson,* see *supra* text accompanying notes 448-58.

554. For a discussion of *Robinson* and its impact on later constitutional interpretation, see *supra* text accompanying notes 462- 550.

555. *Compare* N.D. Cent. Code § 1-02-01 (1975) (rules of statutory construction) *with Robinson* preamble, *supra* p. 211. *Compare* N.D. Cent. Code § 1-02-02 (1975) (words are to be understood in their ordinary sense); *id.* § 1-02-03 (how statutory language is to be construed); *id.* § 1-02-04 (how conflicts in the expression of numbers are to be resolved *with the Robinson* plain language controls rules, *supra* p. 211. *Compare* N.D. Cent. Code § 1-02-07 (1975) (particular language controls general language); *id.* § 1-02-08 (resolving conflicting provisions within the same statute); *id.* § 1-02-09 (Supp. 1985) (resolving irreconcilable statutes or constitutional amendments passed during the same session); *id.* § 1-02-38(2) (1975) (presumption that ''[t]he entire statute is intended to be effective'') *with* the *Robinson* harmonizing rules, *supra* p. 211. *Compare* N.D. Cent. Code § 1-02-01 (1975) (rules of statutory construction); *id.* § 1-02-39 (1), (3) (when court determines legislative intent, it may consider the object sought to be obtained by the legislation and may consider legislative history) *with the Robinson* object to be accomplished language, *supra* p. 211. *Compare* N.D. Cent. Code § 1-02-39 (2), (4) (1975) (when court determines legislative intent, it may consider ''[t]he circumstances under which the statute was enacted'' and ''[t]he common law or former statutory provision'') *with the Robinson* prior state of the law language, *supra* p. 211-12. *Compare* N.D. Cent. Code § 1-02-38 (3), (4) (1975) (it is presumed that in enacting a statute, ''[a] just and reasonable result is intended'' and ''[a] result feasible of execution is intended''); *id.* § 1-02-39 (2), (5), (6) (when a court determines legislative intent, it may consider ''[t]he circumstances under which the statute was enacted,'' ''[t]he consequences of a particular construction,'' and ''[t]he administrative construction of the statute'') *with the Robinson* contemporaneous and practical construction languages, *supra* p. 212.

556. Northwestern Bell Tel. Co. v. Wentz, 103 N.W.2d 245, 252 (N.D. 1960); Egbert v. City of Dunseith, 74 N.D. 1, 7, 24 N.W.2d 907, 909 (1946); *see also* State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 908 (N.D. 1977) (rules of statutory construction are also applicable to constitutional construction); State *ex rel.* Walker v. Link, 232 N.W.2d 823, 825 (N.D. 1975).

557. *See, e.g.,* State *ex rel.* Walker v. Link, 232 N.W.2d 823, 825 (N.D. 1975) (rules of statutory construction provide a basic guideline for constitutional construction).

2.19

are to be resorted to'' in construing an ambiguous constitutional provision.[558] But when construing the constitution, it is the constitutional rules of construction that apply, and not the statutory rules of construction.[559].

Of greater concern, however, is the court's occasional declarations that *all* rules of construction, statutory as well as constitutional, are subservient to the duty to ascertain and give effect to the intent and purpose of the framers and the people who adopted the constitution.[560] As discussed below,[561] the adoption of this view of constitutional construction would serve to destroy the ''plain language controls'' rule,[562] negate the clearly expressed will of the people, and transform what was intended to be the steadfast foundation of our political system into shifting sands incapable of supporting the weight of logic and continuity.

### 5. *Summary: Words Should Be What They Seem*

For almost one hundred years the North Dakota Supreme Court has applied the text of the state constitution in determining and developing the law.[563] Generally speaking, the North Dakota Supreme Court uses text based analysis, looking first to the specific language employed, considering that language in its context to determine its meaning and to harmonize any conflicting provisions, and, if the language is still ambiguous, determining the intent underlying the text of the constitution.[564] This traditional form of analysis, as enunciated in *Robinson,* is a logical method of

---

558. Newman v. Hjelle, 133 N.W.2d 549, 556 (N.D. 1965); *see also* Tormaschy v. Hjelle, 210 N.W.2d 100, 102 (N.D. 1973) (quoting the pertinent language from *Newman;* State ex rel. Link v. Olson, 286 N.W.2d 262, 269 (N.D. 1979) (same).

559. Even the consistent application of the rules of statutory construction would lead to unpredictable results. The canons of statutory construction are often contradictory, and it is likely that each judge would quote them to his or her own ends. *See, e.g.,* State *ex rel.* Sanstead v. Freed, 251 N.W.2d 898, 914 (N.D. 1977) (Vogel, J., dissenting in part) (stating that the court used a canon of construction in the case at bar that it refused to use in other cases); *see also* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules of Canons About How Statutes Are to Be Construed,* 3 VAND. L. REV. 395, 401-06 (1950) (listing numerous canons of construction that are in direct contradiction to each other).

560. McCarney v. Meier, 286 N.W.2d 780, 783 (N.D. 1979); State *ex rel.* Stockman v. Anderson, 184 N.W.2d 53, 57 (N.D. 1971); Newman v. Hjelle, 133 N.W.2d 549, 555 (N.D. 1965); Dawson v. Tobin, 74 N.D. 713, 730, 24 N.W.2d 737, 745 (1946); *see also* State *ex rel.* Germain v. Ross, 39 N.D. 630, 638, 170 N.W. 121, 124 (1918) (primary purpose of constitutional construction is to effectuate the intent of the framers and the people).

561. For a discussion of the court's reliance on the framers' intent over all rules of construction, see *infra* text accompanying notes 880-85.

562. *Cf.* N.D. CENT. CODE §§ 1-02-02, -03 (1975) (codification of the ''plain language controls'' rule in the context of statutory construction).

563. For a list of cases in which the court has applied text based analysis, see *supra* notes 462-77.

564. For an example of how the court applies the text based analysis, see *supra* text accompanying notes 462-550.

2.20

constitutional analysis. Under our system of government, the constitution is the supreme law of the land. To give effect to the constitution, it is necessary to give effect to the language contained therein. When the language is clear, it must be applied. Only when the language is unclear should the court attempt to provide clarity and purpose to that language by examining the intent underlying the constitution.

The supreme court has, on occasion, rejected this traditional method of interpreting the North Dakota Constitution.[565] Within the context of our political system, such conduct defies logic and constitutes a usurpation by the court of the will of the people as expressed in the constitution they adopted. It also subjects the constitution to even greater varying and inconsistent interpretations, depending on what intent is perceived by the various judges who serve on the court. Language, though capable of different interpretations, is at least partly founded on a semblance of meaning and direction. While words may have shades of meanings and contextual subtleties, they at least serve as a common frame of reference and as anchors to a common understanding. Intent, however, is relatively free floating, derived from numerous sources of differing authority, and inherently dependent on suppositions concerning mental processes.[566] Without at least some fixed point of reference in the interpretation of the North Dakota Constitution, it is doubtful that the center can hold,[567] and constitutional interpretation will be subject to the winds of change and the whims of judges.

## B. INTENT BASED ANALYSIS

As has been stated, when employing text based analysis the court looks first to the text of the constitution and considers the language contained therein as controlling.[568] Reference to non-

---

565. For an example of the court's rejection of text based analysis, see *infra* text accompanying notes 603-53.

566. *See, e.g.*, NDJI, Crim. No. 2114 (1985) (North Dakota jury instruction defining intent).

567. Turning and turning in the widening gyre
The falcon cannot hear the falconer;
Things fall apart; the center cannot hold;
Mere anarchy is loosed upon the world,
The blood-dimmed tide is loosed, and everywhere
The ceremony of innocence is drowned;
The best lack all conviction, while the worst
Are full of passionate intensity.
W. YEATS, THE SECOND COMING, ll. 1-8 (1921).

568. For an example of how text based analysis is applied, see *supra* text accompanying notes 462-77.

2.21

for interpreting the articles concerning the elective franchise,[724] the powers reserved to the people,[725] political subdivisions,[726] the legislative branch,[727] and the judicial branch.[728] The 1972 constitution also served as a partial basis for the provisions concerning the size of juries[729] and the qualifications of electors.[730] Moreover, the same general concepts contained in the 1972 constitution concerning the joint ballot of the governor and lieutenant governor,[731] the legislative terms,[732] and the removal of judges[733] were subsequently adopted. And although the amendments concerning legislative terms and removal of judges have since been superseded by more extensive revisions of the constitution,[734] the newer provisions still find at least some basis in the general concepts contained in the 1972 constitution.

The importance of determing the basis of the language of a particular constitutional provision should not go unnoticed. Because of the many differences between North Dakota in 1889 and 1972, the intent underlying the original constitution and the proposed constitution of 1972 will sometimes be different. This difference may result in differing — and perhaps, on occasion, opposite — constructions.

## D.  DIFFERENCES BETWEEN THE STATE AND FEDERAL CONSTITUTIONS

### 1. *Differences in Focus, Breadth, and Purpose*

#### a) The State's Limitations on the Powers of Government and Corporations

Primarily because of concerns relating to the exploitation of North Dakota and the immediate specter of corruption, the final

---

724. Constitutional Amendments, Approved, ch. 695, 1979 N.D. Laws 1730 (Nov. 7, 1978) (elective franchise).

725. *Id.* ch. 696, 1979 N.D. Laws 1731 (Nov. 7, 1978) (initiative, referendum, and recall).

726. *Id.* ch. 718, 1983 N.D.Laws 2218 (June 8, 1982) (political subdivisions).

727. *Id.* ch. 706, 1985 N.D. Laws 2300 (June 12, 1984) (legislative article — members); *id.* ch. 707, 1985 N.D. Laws 2304 (Nov. 6, 1984) (legislative article — procedures).

728. *Id.* ch. 599, 1977 N.D. Laws 1378 (Sept. 7, 1976) (judicial article).

729. *Id.* ch. 603, 1975 N.D. Laws 1579 (Sept. 3, 1974) (size of juries).

730. *Id.* ch. 598, 1977 N.D. Laws 1377 (Sept. 7, 1976) (qualifications of electors).

731. *Id.* ch. 605, 1975 N.D. Laws 1581 (Nov. 5, 1974) (joint ballot).

732. *Id.* ch. 596, 1977 N.D. Laws 1374 (Sept. 7, 1976) (legislative sessions and terms).

733. *Id.* ch. 606, 1975 N.D. Laws 1582 (Nov. 5, 1974) (removal of judges).

734. *See id.* ch. 706, 1985 N.D. Laws 2300 (June 12, 1984) (legislative article — members); *id.* ch. 707, 1985 N.D. Laws 2304 (Nov. 6, 1984) (legislative article — procedures); *id.* ch. 599, 1977 N.D. Laws 1378 (Sept. 7, 1976) (judicial article).

draft of the state constitution was about six times longer than the federal constitution.[735] Distrust of power and fear of corruption resulted in limiting the powers of the governor and providing for the election of many officers of the executive branch, instead of gubernatorial appointments.[736] The length of time in which the legislature could be in session was limited to sixty days,[737] apparently in keeping with the time honored saying that no one is safe while the legislature is in session.[738] Special restrictions were placed on taxation and incurring debt,[739] and extremely specific provisions, including the insertion of the constitutional prohibition against vote-swapping, were adopted to define and hopefully thwart even the simplest forms of corruption.[740] To control the railroads, the drafters of the constitution created the Board of Railroad Commissioners,[741] declared railroads to be public highways,[742] and provided the commissioners with the authority to fix railroad rates within the state.[743]

---

735. E. Robinson, *supra* note 607, at 210.

736. *See* N.D. Const. art. III, §§ 71, 72, 82 (1889) (codified as amended at N.D. Const. art. V §§ 1, 2, 12). For a discussion of the powers of the executive branch of government, see *supra* text accompanying notes 167-207.

737. *See* N.D. Const. art. II, § 56 (1889) (codified as amended at N.D. Const. art. IV, § 7). The constitution has been changed to allow the session to last eighty days. N.D. Const. art. IV, § 7.

738. *See, e.g., In re* A. B., 1 Tuck. 247, 249 (N.Y. Surr. 1866) ("no man's life, liberty or property are safe while the Legislature is in session"). The comments of one state constitutional law scholar also illustrate the general distrust of legislatures in the 1800s:

> [Procedural limitations on state legislative processes] were adopted throughout the nineteenth century in response to perceived state legislative abuses. One observer during this era noted that "one of the most marked features of all recent State Constitutions is the distrust shown of the legislature." Last-minute consideration of important measures, logrolling, mixing substantive provisions in omnibus bills, low visibility and hasty enactment of important, and sometimes corrupt, legislation, and the attachment of unrelated provisions to bills in the amendment process — to name a few of these abuses — led to the adoption of constitutional provisions restricting the legislative process. These constitutional provisions seek generally to require a more open and deliberate state legislative process, one that addresses the merits of legislative proposals in an orderly and rational manner.

Williams, *State Constitutional Limits on Legislative Procedure: Legislative Compliance & Judicial Enforcement,* 17 Publius: The Journal of Federalism 91, 91-92 (1987) (footnote omitted) (quoting Easton, *Recent State Constitutions,* 6 Harv. L. Rev. 109-24 (1892)).

739. *See* N.D. Const. arts. XI, XII (1889) (codified as amended at N.D. Const. art. X). For the restrictions placed on the legislature when taxing and incurring debt, see *supra* text accompanying notes 370-97.

740. *See* N.D. Const. art. II, § 40 (1889) (codified at N.D. Const. art. IV, § 14 (prohibiting legislators from vote-swapping); N.D. Const. art. III, § 81 (1889) (codified at N.D. Const. art. V, § 11) (prohibiting governor from taking bribes or misusing the veto power). For a discussion of the prohibition against legislative vote-swapping, see *supra* text accompanying notes 159-64. For a discussion of the prohibition against the governor taking bribes or misuing the veto power, see *supra* text accompanying notes 203-04.

741. N.D. Const. art. III, § 82 (1889) (codified as amended at N.D. Const. art. V, § 12). The board of railroad commissioners is now known as the public service commission. N.D. Const. art. V, § 12. For a discussion of the creation of the public service commission, see *supra* text accompanying notes 169 and 176, and note 176.

742. N.D. Const. art. VII, § 142 (1889) (codified at N.D. Const. art. XII, § 13). For a discussion of the constitutional limitations on railroads, see *supra* text accompanying notes 415-30.

743. N.D. Const. art. VII, § 142 (1889) (codified at N.D. Const. art. XII, § 13). Authority to regulate and control railroad rates is now given to the legislature. *See id.* art. XIII, § 13.

b) The State's Solidification and Expansion of Individual Rights

While limiting the power of the railroads and the various arms of the new government, the framers also solidified and expanded the individual rights of the citizens of North Dakota. The first article of the constitution, placed even before the article creating the right of the electorate to vote, is entitled the "Declaration of Rights."[744]

Decidedly more expansive and detailed than its federal counterpart,[745] article I of the North Dakota Constitution codified and expanded upon the language of the Declaration of Independence and the Federal Bill of Rights. In relation to individual rights, the North Dakota Constitution includes more expansive language (which is italicized in the text below) than contained in the federal constitution. The North Dakota Constitution includes the right to enjoy and defend life and liberty, the right to acquire, possess, and protect property *and reputation,* and the right to pursue *and obtain* safety and happiness;[746] the recognition of the inherent political power of the people;[747] the right to free exercise and enjoyment of *religious profession and worship;*[748] the right to freely write, speak, *and publish* opinions on all subjects;[749] the right to assemble in a peaceable manner for the common good;[750] the right to apply for redress of grievances;[751] *the freedom to obtain employment wherever possible;*[752] the right of the people to be secure in their person, houses, papers and effects against unreasonable searches and seizures;[753] *the right to a remedy by due process of law for any injury;*[754] the prohibition against excessive bail, excessive fines, and cruel and unusual punishment;[755] the right to a speedy and public trial;[756] the prohibition against double

---

744. It is not without meaning that the constitutional framers chose the rights of the people as the first section of the North Dakota Constitution. Even the highly vaunted Williams Constitution had the rights of the people as article III, following the article on the designation of the state and the relation of the state to the United States. *See* JOURNAL, *supra* note 678, at 64-66. The contents of the declaration of rights is described in detail at text accompanying notes 2-64.

745. For a comparison of the text of the United States Constitution and the North Dakota Constitution, see Appendix B.

746. N.D. CONST. art. I, § 1 (1889) (codified as amended at N.D. CONST. art. I, § 1).

747. N.D. CONST. art. I, § 2 (1889) (codified at N.D. CONST. art. I, § 2).

748. N.D. CONST. art. I, § 4 (1889) (codified at N.D. CONST. art. I, § 3).

749. N.D. CONST. art. I, § 9 (1889) (codified at N.D. CONST. art. I, § 4).

750. N.D. CONST. art. I, § 10 (1889) (codified at N.D. CONST. art. I, § 5).

751. N.D. CONST. art. I, § 10 (1889) (codified at N.D. CONST. art. I, § 5).

752. N.D. CONST. art. I, § 23 (1889) (codified at N.D. CONST. art. I, § 7).

753. N.D. CONST. art. I, § 18 (1889) (codified at N.D. CONST. art. I, § 8).

754. N.D. CONST. art. I, § 22 (1889) (codified at N.D. CONST. art. I, § 9).

755. N.D. CONST. art. I, § 6 (1889) (codified at N.D. CONST. art. I, § 11).

756. N.D. CONST. art. I, § 13 (1889) (codified at N.D. CONST. art. I, § 12).

jeopardy;[757] the right to trial by jury (which subsequently included *the requirement of a unanimous verdict*);[758] the prohibition against imprisonment for debt;[759] the prohibition against taking private property without just compensation;[760] and the prohibition against bills of attainder, ex post facto laws, and laws impairing the obligation of contracts.[761]

### c) Conclusions Drawn from These Differences

The expanded array of basic rights is fundamental to the North Dakota Constitution. The framers had to choose between creating a short constitution that simply described the framework of the government and provided general rights to the people (such as the federal constitution), or creating a long, detailed constitution that delved into numerous facets of state government and individual rights.[762] Although the federal constitution served as a guide to some aspects of the state constitution, the framers of the North Dakota Constitution clearly decided to use the federal constitution only as a starting point, creating a document substantially more detailed and containing expanded rights.[763]

The consequences of this decision are significant, especially concerning the interpretation of rights and the circumscription of the powers of government:

> When the federal Constitution and the first state Constitutions were formed, a Constitution was treated as establishing a mere outline of government, providing for the different departments of the governmental machinery and securing certain fundamental and inalienable rights of citizens, but leaving all matters of administration and policy to the departments created by the Constitution. . . . During the last 50 years state Constitutions have been generally drafted upon a different principle, and have often become in effect extensive codes of laws intended to

---

757. N.D. CONST. art. I, § 13 (1889) (codified at N.D. CONST. art. I, § 12).
758. N.D. CONST. art. I, § 7 (1889) (codified as amended at N.D. CONST. art. I, § 13).
759. N.D. CONST. art. I, § 15 (1889) (codified at N.D. CONST. art. I, § 15).
760. N.D. CONST. art. I, § 14 (1889) (codified as amended at N.D. CONST. art. I, § 16).
761. N.D. CONST. art. I, § 16 (1889) (codified at N.D. CONST. art. I, § 18).
762. This tension between the adoption of a short or long constitution is most clearly shown by a comparison of the views given to the delegates by Territorial Governor Mellette and Judge Cooley of Michigan. For a discussion of these disparate views, see *supra* text accompanying notes 680-84.
763. For a discussion of the differences between the North Dakota Constitution and the United States Constitution, see *supra* text accompanying notes 735-61.

operate directly upon the people in a manner similar to that of statutory enactments.[764]

Unlike the federal model, in which the first ten amendments were intended to have limited operation (solely on the federal government),[765] the rights described in the North Dakota Constitution are for general application. Given this general application, the people may assert their individual rights against anyone — government entities or otherwise. This broad interpretation of individual rights based on the state constitution is certainly within the realm of the intent of those who adopted the North Dakota Constitution, especially in light of the abuses of power delivered upon North Dakotans by the territorial government, the railroads, and corporations in general.[766]

The powers of the state government, although limited by structural checks and balances and the expansive rights described above,[767] are in theory inherently broader than the powers of the federal government. Unlike the federal government, which is ostensibly limited to those powers actually enumerated in the federal constitution, the powers of the state government are general (or plenary) *except* as limited by either the state or federal constitutions:

> We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes, either expressly or by clear implication; while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited. The law making power of the state, it is said in one case, recognizes no restraints and is bound by none except such as are imposed by the Constitution.[768]

---

764. State *ex rel.* Twichell v. Hall, 44 N.D. 459, 468, 171 N.W. 213, 217 (1919) (quoting Winchester v. Howard, 136 Cal. 432, 69 P. 77 (1902), *rev'g,* 136 Cal. 432, 449 (1901)).

765. Brown v. New Jersey, 175 U.S. 172, 174 (1899); *see also* Barron v. Baltimore, 32 U.S. (7 Pet.) 243 (1833) (the first ten amendments to the United States Constitution were intended to apply solely to the federal government).

766. For a discussion of the abuse of power committed by the territorial government, the railroads and corporations, see *supra* text accompanying notes 656-63, 675, 692-94, 703-04, 741-42.

767. For a discussion of the limits on the power of state government, see *supra* text accompanying notes 745-61.

768. State v. First State Bank, 52 N.D. 231, 245, 202 N.W. 391, 396 (1924) (quoting T. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 242 (7th ed. 1903)).

The combined effect of these differences in the two constitutions is that under the North Dakota Constitution, the people possess expansive rights and the arms of state government possess broad powers that are carefully limited by specific provisions and extensive checks and balances. But when a conflict exists between the individual rights of the people and the general powers of the government, which shall prevail over the other? This question of priority has been decisively answered by the North Dakota Supreme Court.

### d) Individual Rights vs. Government Powers

One of the most cogent explanations of the superiority of individual rights over general governmental powers is contained in *Power v. Williams*.[769] *Power* involved a jury verdict in a civil case in which two of the twelve jurors did not concur in the result.[770] The issue on appeal was whether jury verdicts were required to be unanimous under the North Dakota Constitution.[771] The constitution did not, at that time, require unanimous verdicts, stating only that "[t]he right to trial by jury shall be secured to all, and remain inviolate. . . ."[772] The legislature had recently enacted a law which provided that, after twelve hours of deliberation, a jury in a civil action could render a verdict on the agreement of five-sixths of the jury.[773] Since the constitution did not specifically address the issue, the court reviewed the intent of the framers as shown by the debates and the record contained in the journal of the convention.[774] These materials indicated that at one point during the convention a member offered an amendment to the provision relating to juries that would "permit three-fourths of the members of a jury in civil cases to return a valid verdict."[775] The proposal was rejected.[776] The court in *Power* concluded that this action demonstrated the framer's intent to require unanimous verdicts, and construed this requirement into the otherwise abstract provision addressing the right to trial by jury.[777]

---

769. 53 N.D. 54, 205 N.W. 9 (1925).

770. Power v. Williams, 53 N.D. 54, 57, 205 N.W. 9, 10 (1925).

771. *Id.*

772. *Id.* at 60, 205 N.W. at 11; *see* N.D. CONST. art. I, § 7 (1889) (codified as amended at N.D. CONST. art. I, § 13).

773. *Power*, 53 N.D. at 60, 205 N.W. at 11; *see* Act of Mar. 1, 1923, ch. 333, 1923 N.D. Laws 504.

774. *Power*, 53 N.D. at 62-63, 205 N.W. at 12.

775. *Id.* at 62, 205 N.W. at 12.

776. *Id.* at 63, 205 N.W. at 12.

777. *Id.* at 64-65, 205 N.W. at 13.

The party that was successful in the lower court argued, however, that the intent of the framers should not be applied, especially because "the statute was enacted in response to a spirit of progress, and was prompted by a desire to improve the administration of justice."[778] The court, willing to concede the purpose of the new law, nonetheless placed the argument into perspective: "not all change is progress; nor is it true that 'whatever is, is right.'"[779] The court admitted that occasions may arise when "an obstinate juror may obstruct the administration of justice," but recognized the converse possibility that "a firm man may as frequently prevent an unjust verdict."[780] The court went on to state that "[i]t is likewise true that our government rests largely on the theory of majority rule."[781] Nonetheless, situations exist under our form of government in which the majority does not prevail:

> In adopting the constitutional system of government we have agreed to the rule of the majority in matters of civil and political government, but under definite restrictions, devised for the protection of certain fundamental rights. . . . *Justice is not a matter of majorities.* The majority as well as the minority may be wrong.[782]

Thus, under our form of government, individual rights take priority over governmental powers, and any change of this precept and any change of individual rights must be left "to those who have the power to amend the fundamental law."[783]

### 2. *Differences in Interpretation: Substantive Due Process*

The differences between the federal and state constitutions have great significance to lawyers and judges. The differences in topics, breadth, focus, and language of the two constitutions demonstrate entirely different frameworks of analysis. These differences significantly affect the proper interpretation of the North Dakota Constitution, especially in relation to language that

---

778. *Id.* at 65, 205 N.W. at 13-14.
779. *Id.* at 65, 205 N.W. at 14 (quoting without reference to the source, ALEXANDER POPE's AN ESSAY ON MAN, epistle I, l. 294 (1734)).
780. *Power,* 53 N.D. at 65, 205 N.W. at 14.
781. *Id.*
782. *Id.* at 65-66, 205 N.W. at 14 (emphasis added).
783. *Id.* at 65, 205 N.W. at 14.

*2.28*